Urban's Appeal.

Argued October 20, 1941.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, RHODES and HIRT, JJ.

*Lemuel B. Schofield,* with him *Bernard R. Cohn,* for appellant.

*James Francis Ryan,* Assistant City Solicitor, with him *Francis F. Burch,* City Solicitor, for appellee.

OPINION BY CUNNINGHAM, J., February 28, 1942:

Frank Urban, appellant herein, is the owner of several "pinball" machines and a member and representative of the Amusement Machines Association of Philadelphia. The association owns and had placed in divers cigar and drug stores, luncheonettes, taprooms and other public places in the City of Philadelphia, several hundred machines, under an arrangement with the proprietors of the stores, etc., for a division of the coins deposited therein by the persons desirous of playing them. He now appeals, for himself and on behalf of the association, from an order of the court below entered April 30, 1941, by LEVINTHAL, J., in which it was found that one hundred and eleven pinball machines, listed in the return and petition of the superintendent of police at the above number and term, are devices intended to be used for the purpose of unlawful gaming and had been so employed and used, and by which the machines were adjudged forfeited and ordered to be publicly destroyed. The proceedings originated by the

filing, on March 20, 1940, of two returns and petitions by Howard P. Sutton, Superintendent of Police of the City of Philadelphia,—one at No. 21 March Term, 1941, in which two hundred machines were listed, and the other at No. 22 of that term, covering the one hundred and eleven machines included in the order now appealed from.

A similar order was entered March 21, 1941, (immediately following the hearing upon both petitions) for the destruction of the machines listed at No. 21; no appeal was taken from that order. In each petition it was averred that the machines identified therein had been seized by police officers while in operation in various stores, restaurants, etc., and had accumulated in the storeroom of the department of public safety. The prayer of each petition was that a decree be entered authorizing and directing the superintendent of police to destroy the machines therein listed.

. The machines were seized and the returns and petitions presented under the provisions of Section 60 of the Penal Code of March 31, 1860, P. L. 382, 18 PS §1445. That section[1] provides, inter alia, that it shall be law-

---

[1] "It shall and may be lawful for any sheriff, constable or other officer of justice, with or without warrant, to seize upon, secure and remove any device or machine of any kind, character or description whatsoever, used and employed for the purposes of unlawful gaming as aforesaid, and to arrest, with or without warrant, any person setting up the same. And it shall be the duty of such sheriff, constable or other officer to make return, in writing, to the next court of quarter sessions of the proper county, setting forth the nature and description of the device or machine so seized upon, and the time, place and circumstances under which such seizure was made; and the said court, upon hearing the parties, if they should appear, if satisfied that such device or machine was employed and used for the purpose of unlawful gaming as aforesaid, shall adjudge the same forfeited, and order it to be publicly destroyed, and at the same time order such reasonable costs and charges to the seizing officer as they shall deem adequate and just, to be paid by the owner or possessor of such

ful for any officer of justice, with or without warrant, to seize upon and remove "any device or machine of any kind, character or description whatsoever, used and employed for the purposes of unlawful gaming," and that upon a return, in writing, to the next court of quarter sessions of the proper county, setting forth the nature and description of the machine so seized, the court, "if satisfied," upon hearing the parties, "that such device or machine was employed and used for the purpose of unlawful gaming, ...... shall adjudge the same forfeited, and order it to be publicly destroyed."

The validity of the order for the destruction of the one hundred and eleven machines here involved is challenged primarily upon the ground that the evidence introduced by the police department (appellant having offered none) was legally insufficient to support the decree. During the oral argument it was also suggested that Section 60 of the Penal Code of March 31, 1860, supra, had been repealed by the recent Penal Code of June 24, 1939, P. L. 872, effective September 1, 1939, 18 PS §4101 et seq., and supplemental briefs were submitted upon that question. Appellant's contention upon this branch of the case is without merit.

A number of the provisions of the code of 1860 relating to unlawful gaming were reenacted in the code of

device or machine, or in case of his default, or in case he cannot be found, to be paid as costs are now by law paid upon indictments; and such adjudication shall be conclusive evidence to establish the legality of such seizure, in any court of this commonwealth, in any cause in which the question of its legality shall arise; and in any case in which a decree of forfeiture shall not be pronounced, if said court shall, upon the evidence, be satisfied that there was probable cause for the seizure, they shall certify the same, which certificate shall be a bar to any action brought against the officer for or on account of such seizure, in those cases in which the said officer returns, or offers to return such device or machine; and in all cases shall prevent a recovery in damages, for any sum beyond the real value of the device or machine seized."

1939; for instance, section 55 of the Act of 1860, as amended in 1923, and 1925, 18 PS §1441, was substantially reenacted as section 605 of the code of 1939, 18 PS §4605. By this section it is provided that whoever sets up or establishes or causes to be set up or established "any game or device of address, or hazard, at which money or *other valuable thing* may or shall be played for, or staked or betted upon" is guilty of a misdemeanor. (Italics supplied.) The concluding paragraph of the section reads: "That this section shall not be construed to apply to games of recreation and exercise, such as billiards, bagatelle, ten pins, et cetera, *where no betting is allowed."* (Italics supplied.)

Other sections of the code of 1860 defining and punishing certain offenses coming under the general subject of gambling, and the Act of April 29, 1925, P. L. 357, 18 PS §1447, prohibiting the manufacture of gambling devices, are reenacted as sections 604 and 606 of the code of 1939, 18 PS §§4604, 4606. It is true that neither section 59 of the code of 1860, 18 PS §1444, relative to the seizure of gaming devices or apparatus upon warrants issued by magistrates along with warrants for the arrest of persons charged with being common gamblers, setting up a gambling house or enticing persons to visit the same, nor section 60 of the code of 1860 (here involved) was expressly reenacted in the code of 1939. But it does not follow that these sections were repealed by the new code. Section 1201 of the code of 1939, 18 PS §5201, is the repealing section and recites a list of acts and parts of acts repealed, in whole or in part, but subject to certain qualifications therein set forth. This list includes the entire Penal Code of March 31, 1860, P. L. 382, but, as indicated, it is expressly provided in the repealing section of the new code that the acts and parts of acts therein cited for repeal are not repealed "in so far as the same (a) relate to the jurisdiction to indict and try offenses; or (b) fix the limitation of time within which persons charged with offenses

may be indicted; or (c) relate to evidence or the competency of witnesses; or (d) *relate to search and seizure;* or (e) relate to the return of transcripts of cases; or (f) relate to the form or contents of indictments." (Italics supplied.)

We adopt the following excerpt from an unreported opinion by FINLETTER, P. J., filed at March Term 1940, Miscellaneous Docket, of the court below, and referred to in the supplemental briefs: "The Act of 1939 saves from repeal all parts of the Act of 1860 which *'relate* to search and seizure.' 'Relate' is a very broad word and must refer not only to ...... the seizure of the unlawful devices, but also to the disposition of the latter. All of these things 'relate' to the subject, and with anything that relates thereto the amending act evidently intended no repeal. To hold that it did would be to convict the legislature of a vacillation of policy, which is not apparent in the later act unless the contention of the defendant is assented to. The policy of the legislature in both statutes is hostile to gambling, and, that being so, it cannot be believed, in the absence of express repeal, that any relaxation was intended by the amending act. If such was the intent it was most inaptly expressed by preserving from repeal anything that 'related' to search and seizure."

In approaching the consideration of the controlling question of law involved upon this appeal—the sufficiency of the evidence upon this record to satisfy an unbiased mind to that degree of certainty which a judicial disposition of the issue requires that the machines listed in the petition at No. 22 were "employed and used for the purpose of unlawful gaming"—we have a guide in a former case in this court entitled In re: *Petition of Superintendent of Police of the City of Philadelphia for Order to Destroy Gambling Implements,* 113 Pa. Superior Ct. 520, 173 A. 753, affirmed by the Supreme Court, upon the opinion of this court, under the title,

*Mills Novelty Company's Appeal*, 316 Pa. 449, 175. A. 548.

That was a case in which it was shown that the slot machines there involved were ostensibly harmless mint vending devices, but, by an interior mechanical adjustment requiring about two minutes, their operation could be so changed that either slugs (sometimes called "tokens") or a number of nickels, varying from one to twenty in number, would occasionally be ejected instead of mints. The tokens were redeemable, at five cents each, in merchandise or cash and were so redeemed by the proprietors of the stores in which several of the three hundred machines covered by the petition in that case were seized. There, as here, it was contended that the police department had not shown, with respect to each and every machine seized, that nickels or tokens had been received therefrom. We pointed out there was positive and uncontradicted testimony that the machines there in question were all of the same type and held the evidence was sufficient to satisfy a court that they had been employed and used for the purpose of unlawful gaming.

In the case now at bar there was a joint hearing upon the two petitions above mentioned. It was not controverted that the machines listed at No. 22 were of exactly the same type as those involved at No. 21. No exception was taken to the order directing the destruction of the machines covered by the petition at No. 21.

The following findings of fact by the presiding judge are fully sustained by the testimony given by a number of police officers and by the demonstration before him of the manner in which one of the machines involved in this appeal was constructed and could be operated:

"To operate one of these machines, a five cent piece is placed in a slot thereby releasing five small metal balls into a small side alley. The playing field consists of an inclined board set in a cabinet and on which, at

various points, there are obstructions and rubber bumpers of various sorts. At some points, there are levers which a moving ball trips or throws. By pulling a spring lever at the side of the machine, one of the balls is projected up the side alley to the top of the inclined playing field whence, by the operation of the law of gravity, it rolls down the board striking the various bumpers, obstructions, and levers in its course. On the backboard, operated by electricity, points are automatically registered as the ball comes into contact with these obstructions. Brilliantly colored electric lights flash as these points are registered. Should the total score secured by the play of five balls be higher than a predetermined amount, the machine records what are called 'free plays.' The player then can operate the spring lever and continue play without inserting another five cent piece in the slot.

"Concealed beneath the cabinet is a small button which, if pushed, will 'knock down' or cancel one or more free plays. As this is done, a mechanism inside the machine registers the number of free games thus cancelled by the operation of the button. ......

"It appears that the score which must be attained before free games are won can be changed by the storekeeper by adjusting a mechanism within the machine. Also, the probabilities of a player securing such a score can be controlled, within substantial limits, by readjusting certain rubber bumpers and the wooden legs of the machine affecting the incline. Printed instructions covering the details of such adjustments are sent with every machine. Some of these printed sheets speak of 'payout scores' and 'points' worth five cents each."

In order to support the petition, the police department had the burden of showing that the machines seized by them were gambling devices per se and had been seized in places and under circumstances which would justify an inference that they had been used for unlawful gaming. The legislative definition of a gam-

bling device is found in section 604, supra, of the present code and reads: "Any punch board, drawing card, slot machine, or any machine or device used or intended to be used for gambling." By section 605, supra, it is, inter alia, provided: "Whoever sets up or establishes, or causes to be set up or established, any game or device of address, or hazard, at which money or other valuable thing may or shall be played for, or staked or betted upon, ...... is guilty of a misdemeanor."

It is not contended that any element of skill is involved in playing these pinball machines. The player has no control over the course the ball may take; its movements and stopping place are entirely matters of pure chance.

The devices here in question are complete in and of themselves. The money staked or betted by the player is deposited by him in the machine. He sets the balls in motion and the machine automatically records and shows the score to the player and the proprietor of the store, restaurant, etc., in which the machine has been set up by its owners. Nothing but the machine itself is necessary to decide whether the player wins or loses. The distinction, in so far as confiscation is concerned, between a device of the nature here involved and a teletype machine even knowingly used to furnish or obtain information to be used in gambling, was set forth by President Judge KELLER in *American T. & T. Company's Appeal*, 126 Pa. Superior Ct. 533, 191 A. 210. The present device is, in the language of 12 R. C. L. 726, Section 26, adopted by us, with approval, in the case just cited, "the tangible thing with which the game, on which money may be lost or won, is played, as distinguished from the game itself."

In the course of the opinion of the court below this paragraph appears: "Persons not desirous of playing their free games immediately receive a metal token for each free game not played and cancelled. These tokens can be inserted, in lieu of five cent pieces, in 'pinball'

110

machines located throughout the city."

We have been unable to find any sworn testimony relative to the giving of tokens to persons entitled to, but not desiring to play, free games. The remarks of the presiding judge are evidently based upon a statement of counsel for appellant in the course of a colloquy between the court and counsel on both sides in which the court was endeavoring to have counsel define the issues arising under the petitions. At page 18a Mr. Schofield (speaking for appellant) said: "We will show that if a man wins a number of free games on that machine by being skillful enough to reach a certain score, often times he doesn't want at that time to play off those free games. As Mr. Ryan, (counsel for petitioner) says, the machine is so arranged that if a certain score is reached and the player is entitled to free games, he can go on and play them without putting a nickel in each time. The machine operates without that. Now, however, suppose a man has won ten free games and he doesn't want to wait and play those ten games off; suppose he wants to do it later on? . . . . . . If he wins ten games, he often times doesn't have time to play them. Consequently, this association and the members thereof have devised a system of handing out tokens which they have with their own association's name on it and identified in that way, so that the player, if he gets ten free games, can get ten of these tokens and come back at any time and play that machine the number of times that he is entitled to by the free games he has won by reaching that number. The Court: Can he play that particular machine or any one? Mr. Schofield: Naturally, any of the machines operated by the association so far as that is concerned. That is one of the difficulties, too, and that is one of the reasons for this meter."

The testimony of the police officers who testified to actual gambling upon six of the machines included in the petition at No. 21 was not that they, or other players

whom they saw playing the machines, received tokens for unplayed free games, but that the winning players were given cash or merchandise of some kind by the store or restaurant keepers in whose places of business the machines had been set up. For instance, Officer James J. Doran testified, p. 71a: "Q. Did you make any investigation of the playing of a pinball machine at 4123 Frankford Avenue? A. I did. Q. When? A. On December 17 about 12:30 P.M. Q. What did you see while you were there? A. I entered this restaurant and noticed quite a few men around the pinball machine playing it. After watching this machine for about an hour I saw a man hit the machine for ten games and after calling the attention of the proprietor who told him to clear the machine by the button underneath the machine, he went to the restaurant counter where he was paid 50c for these games. About ten minutes later another man hit this same machine for seven games. He also went to the counter, but instead of him knocking the button to clear the machine the counter girl came over and she cleared the machine from the button underneath it. Q. Was he paid? A. Yes, sir; he was paid 35c at the counter. Q. The machine was then confiscated? A. The machine was confiscated on December 19, a day or so later."

Officer George S. Barrett testifying, inter alia, about a machine at 122½ South 8th Street, stated, p. 75a: "Men were playing there and there was a score made of 22,000 and the proprietor paid the man 25c as a prize. Q. Did he do anything to the machine when he paid it? A. He clicked the button underneath and threw the plays off that the man was entitled to play back again free if he hadn't received the quarter as a prize." The same witness testified, p. 77a, with reference to a place at 17th and Market Streets: "I myself went into the place and played the machine for several nickels; making a score I was paid 20c in cash by James Fisher.

112

Q. Who was James Fisher? A. He was the manager of the place."

As to the one hundred and eleven machines, listed in the petition upon which the order appealed from was made, it is clear under the testimony that each of them was in operation in the store, or luncheonette, in which they were seized when the officers entered, and that each was identical in type and construction with the six described in the testimony of the officers.

Under the testimony as a whole, it is apparent that the police department by its petitions brought before the court some three hundred machines which conceivably could be played as a pure matter of amusement but that, as in the Mills slot machine case, various electrical contrivances and gadgets had been added to them from time to time which turned them into gambling devices per se. If the "free games" feature had not been added, it is evident no attempt would have been made by the police department to confiscate them. And even if the "free games" feature had been so *restricted* that the player could get nothing more than the privilege of operating the machine one or more times, as the case might be, without depositing another coin, it is at least doubtful whether the machine would have been seized— that is to say, if the only thing which could "be played for, or staked, or betted upon" the machine was the privilege, upon making a score above a predetermined number, to again operate the machine without depositing a nickel, the question would be debatable, under conflicting authorities in various jurisdictions, whether a "valuable thing," within the meaning of our present penal code, was being played for. The presiding judge devoted a part of his opinion to a discussion of this question and reached the conclusion that the privilege or license "to play additional games of amusement on these pinball machines," was an intangible thing having some intrinsic value.

In our opinion, it is not necessary to go that far in

order to make a proper judicial disposition of this case. There is upon the record evidence that all of the one hundred and eleven machines listed in the petition at No. 22 were in public operation when seized; that each of them awarded "free games" to lucky players; that each was equipped with mechanism to cancel the "free games" and record the games thus eliminated; that the main purpose, indicated by the evidence, of the installation of such mechanism was that the machines could be used and employed for the purpose of gambling; and that each machine was so constructed that, by manipulating certain screws and moving a "plumb-bob" up or down a shaft, the obtaining of the "winning scores" would be made either more or less difficult, depending upon which way the plumb-bob was moved.

In considering the sufficiency of the evidence submitted by the police department, it must be kept in mind that we are here dealing with a proceeding in rem. The issue is whether a judicial fact finder could reasonably be satisfied from all the evidence that the owners of the devices included under the petition at No. 22 had distributed them throughout the city to the general end that they might be used for unlawful gaming, as a lure to increase the flow of nickels into them, and that they were being so used when seized. The issue was not between the Commonwealth and one or more defendants charged in an indictment, under section 605 of the code, with the misdemeanor of setting up a gambling device. This distinction obviously affects both the quantum and quality of the evidence essential to sustain the affirmative of the respective issues.

Upon a review of all the evidence, we are convinced here, as we were in the *Mills Novelty Company's Appeal*, supra, that it was not necessary for the petitioner to show that each machine had actually been used for unlawful gaming.

In our opinion, it follows, when the principles of law set forth in the case just cited are applied to the evi-

dence appearing upon this record, that the order now appealed from should be affirmed.

The case of *Com. v. Mihalow*, 142 Pa. Superior Ct. 433, 16 A. 2d 656, cited and relied upon by counsel for appellant, is readily distinguishable. The machine involved in that case, while commonly known as a pinball machine, was, in fact, a miniature bowling alley. The defendant was the proprietor of a grill room in which the machine was located. He was placed on trial under an indictment charging him with a misdemeanor under section 605 of the code of 1939. The Commonwealth did not allege, nor was there any proof, that he wagered with any player on the results of playing the machine.

We are not to be understood as adopting all the views expressed in his opinion by the learned presiding judge, but are convinced that his final order of April 30, 1941, is fully justified by sufficient competent evidence. The assignments of error are severally overruled.

Order affirmed at cost of appellant.