## Wigton's Return.

338

Argued October 29, 1942.

Before KELLER, P. J., CUNNINGHAM, BALD-RIGE, RHODES, HIRT and KENWORTHEY, JJ.

*Willis A. MacDonald,* District Attorney, for appellant.

*Thomas B. Caldwell,* of *Caldwell, Fox & Stoner,* and *A. R. Cingolani,* for appellees and *Lemuel B. Schofield* and *W. Bradley Ward,* for interested party under Rule 61.

OPINION BY KENWORTHEY, J., January 28, 1943:

The Commonwealth sought to destroy seven pin-ball machines on the ground they were devices used for the purpose of unlawful gaming. The proceeding was under the Act of March 31, 1860, P. L. 382, §60, 18 PS §1445.[1] The court below was not "satisfied that such device[s] or machine[s] [were] employed and used for the purpose of unlawful gaming" and made an order denying the prayer in the petition for leave to destroy them. The Commonwealth appeals.

---

[1] We held in *Urban's Appeal,* 148 Pa. Superior Ct. 101, 24 A. (2d) 756, that this section was not repealed by the Penal Code, Act of June 24, 1939, P. L. 872, §101 et seq., 18 PS §4101 et seq.

Section 60 of the Code of 1860 provides: "It shall and may be lawful for any sheriff ...... with or without warrant, to seize upon ...... any device or machine of any kind, character or description whatsoever, used and employed for the purposes of unlawful gaming as aforesaid ......" This section does not define gaming; we must look elsewhere for the legislative policy. *American Telephone and Telegraph's Appeal*, 126 Pa. Superior Ct. 533, 191 A. 210. 'Unlawful gaming' is defined in Section 56 and 55 of the Code of 1860 (18 PS §§1421, 1441) which were re-enacted by Sections 603 and 605 of the Penal Code of 1939 (18 PS §§4603, 4605). Section 603 provides: "Whoever maintains any gambling device or apparatus to win or gain money or other property of value ...... is guilty of a misdemeanor ......" Section 605 provides: "Whoever sets up ...... any game or device of address or hazard, at which money or other valuable thing may or shall be played for, or staked or betted upon ...... is guilty of a misdemeanor ...... This section shall not be construed to apply to games of recreation and exercise such as billiards, bagatelle, ten pins, etc., where no betting is allowed."

In *Urban's Appeal*, 148 Pa. Superior Ct. 101, 24 A. (2d) 756, we recently upheld the destruction of a large number of pin-ball machines seized in Philadelphia upon proof that a substantial number of them were actually used for gaming purposes and that they were all similarly operated in public places. It was there shown that it was the practice of the proprietor of the store or luncheonette in which the machines were operated to pay off the winners of 'free games' in money—five cents for each. The number of 'free games' won would appear on a recording meter and by the operation of a simple mechanism, the 'free games' would then be 'knocked down' or cancelled and the machines would be ready for further play upon the insertion of another coin.

In the present case, there is no evidence that the players were ever paid off in money or merchandise, or that gambling was permitted between the players. And the machines do not have the button or mechanical device for cancelling the 'free games' nor the recording meter which were used, in the machines in *Urban's Appeal,* to facilitate their use for gambling, although it appears that if a player who wins the right to play 'free games' does not desire to play them, some of the games—perhaps all but one—may be cancelled without play by repeated operation of the coin plunger.

This appeal therefore presents two questions: (1) Does the fact that the player may win the right to play 'free games' by making a high score or (2) the fact that it is possible to cancel at least some of the 'free games' without playing them, justify the conclusion that the machines are used for unlawful gaming?

*First.* In the course of the opinion in *Urban's Appeal,* Judge CUNNINGHAM said at pages 112-113: "If the 'free games' feature had not been added, it is evident no attempt would have been made by the police department to confiscate them. And even if the 'free games' feature had been so *restricted* that the player could get nothing more than the privilege of operating the machine one or more times, as the case might be, without depositing another coin, it is at least doubtful whether the machine would have been seized—that is to say, if the only thing which could 'be played for, or staked, or betted upon' the machine was the privilege, upon making a score above a pre-determined number, to again operate the machine without depositing a nickel, the question would be debatable, under conflicting authorities in various jurisdictions, whether a 'valuable thing,' within the meaning of our present penal code, was being played for. The presiding judge devoted a part of his opinion to a discussion of this question and reached the conclusion that the privilege

or license 'to play additional games of amusement on these pinball machines,' was an intangible thing having some instrinsic value.

"In our opinion, it is not necessary to go that far in order to make a proper judicial disposition of this case."

Obviously, the right to play a 'free game' is neither money nor 'other property of value' within the meaning of Section 603. Is it a 'valuable thing' within the meaning of Section 605? We think it is not. We assume, because there is nothing in the record to the contrary, that the machines involved in this case were played exclusively for recreation or amusement—for the purpose of making a high score just as ten pins or billiards are usually played. If the player cannot get any other consideration or reward from the play except the right to play again, his incentive for playing *must* be a recreational or amusement incentive only. Syllogistically if the player enjoys the play enough to pay money for the privilege the right to play has some value to him. But to come within the act, it must not merely *have* value to him; it must be a *thing* of value. "General words shall be construed to take their meanings and be restricted by preceding particular words." Stat. Const. Act of May 28, 1937, P. L. 1019, art. III, §33, 46 PS §533; *City of Corry v. Corry Chair Co.,* 18 Pa. Superior Ct. 271. We think the close relationship in Section 605 of the words 'money' and 'thing' in the expression 'money or other valuable thing' compels, in view of the legislative mandate, a construction of the latter in the narrower sense—"an object; anything which can be apprehended or known as having existence in space or time as distinguished from any thing which is solely an object of thought; ...... b. an inanimate object ...... hence now in pl., possessions; goods." Webster's New International Dictionary.

What he plays for is *no* thing, of value.

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the Legislature ...... When words of the law are not explicit the intention of the Legislature may be ascertained by consideration, among other matters, of—(1) the occasion and necessity for the law; ...... (3) the mischief to be remedied; (4) the object to be attained ......," Stat. Const. Act, supra, art. IV §51, 46 PS §551. And penal laws must be strictly construed. Ibid art. IV §58, 46 PS §558.

The conventional, the ordinary conception of gambling is that it is "the act of playing or gaming for stakes ...... a playing or gaming as at checkers, dice, cards, horse-racing, cock fighting or some other sport or contest as well as a staking or risking of money to be lost or won on the issue." Webster's New International Dictionary. Bouvier defines gaming as "a contract between two or more persons, by which they agree to play by certain rules at cards, dice or other contrivances, and that one shall be the loser and the other the winner." It has been defined judicially as "an agreement between two or more persons to risk their money or property in a contest or chance of any kind where one may be gainer and the other loser." See 24 American Jurisprudence, p. 398. After pointing out that it is ordinarily the promise by one to *pay* another "on the color of a card, or the fleetness of a horse," Mr. Justice THOMPSON in *Brua's Appeal*, 55 Pa. 294, 299, said: "The lucky winner of course is the gainer, and he will continue so until fickle fortune in due time makes him feel the woes he has inflicted on others."

The now outmoded melodramas, in which the irresponsible father or husband wagers—and usually loses—the old homestead or his favorite riding horse at cards dramatically illustrate that to limit, in any definition of gambling, the thing to be *played for* to

money would make the definition too narrow. And although we are not prepared to say that a gambling contract must *always* be bilateral in the sense that the loser—here the proprietor of the pin-ball machine— must stand to *lose* money, merchandise or other property or *thing* of value, nevertheless, the thoughts we have just quoted point, in a sense, to "the mischief to be remedied" and "the object to be attained" by the law. Bearing in mind that penal laws must be strictly construed, we are not persuaded that the legislature intended a definition of gambling broad enough to make unlawful, gaming in which the player, in addition to the pleasure of playing, stands to gain nothing but the right to play again without paying for it and the loser to lose nothing but the compulsion to let him play.

We hold that the 'free games' feature does not warrant the destruction of the machines as devices used for the purpose of unlawful gaming.

*Second.* Does the fact that it is possible to cancel some of the 'free games' without playing them warrant destruction of the devices in the absence of proof they were actually used for unlawful gaming?

The legislative emphasis in Section 60 of the Act of 1860 is on *use and employment,* not the nature of the device. The expression 'gambling device' does not appear anywhere in the section although it does appear in Section 603 of the Penal Code. It condemns *"any* device or machine of *any kind, character or description whatever,* used and employed for the purposes of unlawful gaming as aforesaid." On the other hand, the authority to destroy them is limited to cases in which the court "is satisfied that such device or machine was *employed and used* for the purpose of unlawful gaming as aforesaid." There is nothing in the section which authorizes the seizure and destruction of devices merely on the ground that it would be possible to use them for unlawful gaming. This is made doubly clear by the

proviso in Section 605 (Section 55 of the Code of 1860) that: "This section shall not be construed to apply to games of recreation and exercise such as billiards, bagatelle, ten pins, etc., where no betting is allowed." Obviously it would be possible to use all the games specifically mentioned and innumerable others, in themselves harmless, for unlawful gaming; it would be possible to use the pin-ball machines for unlawful gaming even if they had no 'free games' feature whatever, through an arrangement by which the proprietor would bet with the players on the score or permit the players to bet between themselves. And although we have upheld the seizure and destruction of slot machines without proof that they were actually used for unlawful gaming, the basis of the decision was that, "when the nature of the machine is shown to be such as fits them *solely* for an unlawful purpose, they become in the language of some of the courts of other states 'outlaws'." *Com. v. Kaiser,* 80 Pa. Superior Ct. 26.

Moreover, the right to seizure and destruction under Section 60 is not limited to devices or games of *chance.* There seems to be some misunderstanding about this. The devices prohibited by Section 605 are games or devices of 'address or hazard.' 'Address' is not a synonym of 'hazard,' it is an antonym; it means "skillful management; dexterity; adroitness." Webster's New International Dictionary and the New Century Dictionary. Thus a chess board and men set up for play with a 'house player' and played for stakes would be subject to seizure and destruction (see *State ex rel. Dussault v. Kilburn,* 111 Mont. 400, 109 P. (2d) 1113, 1116); whereas, the mere fact a game involves a substantial element of chance would *not* be enough to condemn it. *Com. v. Mihalow,* 142 Pa. Superior Ct. 433, 16 A. (2d) 656. This is not to say that proof that a device or machine operates *entirely* by chance is without significance. Since normally people do not play

games of pure chance for recreation or amusement without betting on the outcome such proof would be some *evidence* of their use for unlawful gaming.

The pin-ball machine is essentially a modified game of bagatelle. Since the burden of proof was on the Commonwealth and there is no evidence whether playing involves any element of skill we are bound to assume that it does. Appellees in their brief vigorously assert the play involves skill; that the speed of the ball, which is controlled by the player, materially affects the score; and that the Supreme Court in *Com. v. Klucher,* 326 Pa. 587, 588, 193 A. 28, referred to them as 'games of skill.' And in *Com. v. A Certain Gambling Device,* 151 Pa. Superior Ct. 346, (opinion filed herewith) it was stipulated that "the playing of the game on the machine involves a mixture of chance and skill."

One must keep a proper perspective. In *Urban's Appeal,* the existence of a simply operated 'free games' cancelling device and recording meter *in connection with proof that a substantial number of them were actually used for unlawful gaming* was held to be *evidence* which helped to justify a finding that all the machines were used for unlawful gaming. See also *Mills Novelty Co.'s Appeal,* 316 Pa. 449, 175 A. 548. Although there is no proof in this record that they have, it may be that the proprietors of the machines involved in this case will use them for unlawful gaming. But even if we were fearful of that development we have no power to make a broad, sweeping, prophylactic rule; the legislature has given us no such authority.

It is scarcely necessary for us to give lip-service to the considerations which make gambling a menace to public welfare. Although it is sanctioned in some form in many of our states the public policy of this Commonwealth is opposed to it. *Plotnick v. P. U. C.,* 143 Pa. Superior Ct. 550, 18 A. (2d) 542. The difference between the public risk of operation of pin-ball machines

on the one hand and of bowling alleys and billiard parlors on the other lies, perhaps, in the fact that the former are easily accessible to children and others who can ill afford to spend their limited means for such an idle pastime. The law should deal severely with any who further exploit them by adding a gambling incentive. And because of their large numbers and the diversity of their distribution, there may be presented a difficult police problem. But the remedy, if it comes, must emanate from the legislature.

We hold that the mere fact that these machines are so constructed that it is possible to cancel some of the 'free games' without playing them is not, by itself, sufficient evidence to support a finding that they were used for the purpose of unlawful gaming.

The order is affirmed,[2] costs to be paid by the Commonwealth.

---

[2] We have deliberately refrained from a discussion of the numerous authorities from other jurisdictions which have been cited. They are discussed and analyzed in a comprehensive note in 135 A.L.R. 104. Although any student of the subject must concede the existence of a difference of opinion many of the cases involve interpretation of statutes or of a public policy which differs from ours. In a number of States games of chance are prohibited whether or not they are used for gambling.