## Commonwealth *v.* Rankin et al., Appellants (No. 2).

Argued October 27, 1944; reargued March 13, 1945. Before BALDRIGE, P. J., RHODES, HIRT, DITHRICH and Ross, JJ. (Reno, J., absent.)

*Dean D. Sturgis* and *J. C. Glassburn, with* them *D. W. Henderson* and *W. F. Lane,* for appellants.

*James I. Marsh,* Special Deputy Attorney General, with him *James H. Duff,* Attorney General, for appellee.

OPINION BY BALDRIGE, P. J., July 19, 1945:

These appellants were indicted, charged with violating the Act of June 24, 1937, P. L. 2017, Article III, §315, 62 PS §2265, which provides in substance that it shall be the duty of county commissioners to purchase all supplies for the maintenance of the inmates of the institutions under their supervision, by written contract where the sum of $500 or more is involved; to give due notice, and invite sealed proposals for the furnishing of needed supplies and award all such contracts to the lowest responsible bidders, etc. The indictment contains six counts, the first of which charges that during the year 1938 the defendants in violation of their duties purchased from the Center Gas Company, for the maintenance of the Fayette County Institution District Home and Farm, certain supplies, to wit, 6650 gallons of gasoline involving an expenditure of $1,-064.00 without inviting sealed proposals, etc., and entering into written contracts with the lowest responsible bidder.

The second, third, and fourth counts charged substantially the same offense for the years 1939, 1940, and 1941.

The fifth count charged that the defendants, during the year 1938, violated the foregoing section in purchasing certain supplies consisting of fixtures, materials, and equipment for the construction of a house on the institution district's property, involving expenditures of the sum of $3105.65, without any advertisements, inviting sealed proposals, and failing to enter into a written contract or contracts for the purchases.

The sixth count is identical except it relates to purchases totalling $3618.77 made during the year 1939.

The defendants were tried together and were found guilty as charged on all counts and these appeals followed.

The principal question before us in the considera- tion of the counts involving the sale of gasoline, is whether there was a separate contract each time gaso- line was obtained, or whether there was a single con- tract embracing a year's supply of gasoline. There is no substantial dispute as to the essential facts, which may be stated as follows:

Prior to January 1, 1938, what is now the Fayette County Institution District was under the control and management of the poor directors of the county. In 1935 they made an "arrangement" with the Center Gas Com- pany to install on the county premises an underground tank with a capacity of 550 gallons with an electric pump attached. This equipment, owned by the gas com- pany, was installed before January 1, 1938, when the county commissioners took over the duties of the former poor directors. As there was no other provision on the county farm, where the tank was located, for the storage of gasoline the arrangement previously made by the poor directors was continued by the commissioners. The gas company furnished gasoline from its own tank from time to time when needed and billed the county for each delivery. According to R. W. Higinbotham, called by the commonwealth, when asked as to the methods of keeping the records of the gasoline furnished to the institution district: "When the gasoline was delivered to the tank, there was a delivery slip made out, and these delivery slips were brought into the office and posted on a ledger account. When payment was re- ceived, credits were applied against this account." He testified further as follows: "Q. You were selling Fay- ette County, were you not, and the gasoline was pur- chased by and paid for by the county commissioners right here in the court house? A. It was paid for as it came out of the tank, but not as it was put in the tank." The county did not contract with the Center Gas Com- pany to buy the gasoline; it was perfectly free to termi- nate this arrangement at any time. The only obligation

upon its part was to pay for the gasoline as it was furnished from this tank installed on the county property. In other words, the transaction was carried out in the same manner as though the gasoline had been bought at any gas station. During 1938 the total purchases of gasoline amounted to $1051.95; for 1939, $1160.35; for 1940, $1622.79; and in 1941, $1514.17, but no one purchase amounted to $500.00.

A serious question arises at the threshold of our consideration of the legal aspects of this case, as to whether the language used in section 315, supra, viz, "to purchase all *supplies* for the *maintenance of the inmates* of the institutions under their supervision" (italics supplied) is broad enough to include anything other than food, provisions, clothing, etc., which meet the necessities of the inmates of the institutions. That doubt is strengthened by reading section 316, which is broader in its terms. That section relates to commissioners being concerned in any contract for furnishing supplies for the inmates of the institutions "or for the construction or improvement of property under his control." Not a word is said about "property" in section 315. It appears that when the legislature intended to be more comprehensive in the subjects to be covered, it used appropriate language to manifest its purpose. Under section 58 of the Statutory Construction Act of May 28, 1937, P. L. 1019, Art. IV, 46 PS §558, section 315, which is a general provision, must be strictly construed and the words used therein cannot be extended beyond their plain meaning: *Walker v. Pennsylvania Railroad Company*, 151 Pa. Superior Ct. 80, 83, 29 A. 2d 358; *Wigton's Return*, 151 Pa. Superior Ct. 337, 30 A. 2d 352.

But aside from the scope to be given the language used in section 315 under which the indictment is laid, we are convinced that each withdrawal of gasoline by the county from the storage tank was a separate purchase. We find no evidence that this system was em-

ployed as a subterfuge to cover up the real transaction so that each contract would indicate an expenditure of less than $500.00.

It is true that the commissioners did in their annual budget include an item of $1500.00 as the total amount to expend for gasoline, but that action did not constitute, nor was the budget part of, a contract. One of the main functions of a budget is to control expenditures during a fiscal period, which cannot be in excess of the amount appropriated by the commissioners, otherwise they are liable to be surcharged in a civil proceeding: *Kistler et al. v. Carbon County et al.*, 154 Pa. Superior Ct. 299, 35 A. 2d 733. The commissioners were not compelled, however, to enter into a contract covering a period of a year for the purchase of gasoline simply because the budget states that no more than a determined amount would be spent annually. The quantity of gasoline required by the county was necessarily somewhat uncertain and to buy as needed, as these county officials did, which might well prove to be to the advantage of the county, is not a criminal offense. The court was clearly wrong, in our judgment, in instructing the jury as follows: "If you believe the testimony of the Commonwealth and of the defendants to the effect, that they budgeted over $500.00, namely $1500.00 for each of the four years in question, then you are justified in finding that each of these years constituted a contract involving more than $500.00."

What we have said already is to a large extent applicable to the charges in the fifth and sixth counts, which cover the purchases of materials for the construction of a house to be occupied by Mr. Williams, the superintendent of the county farm. In 1938 and 1939 funds from the W. P. A. were available for labor for such an undertaking. To take advantage of this opportunity the commissioners passed a resolution to contact the W. P. A. representatives and submit to them a project for the erection of a six-room house on the county

home farm, under which the W. P. A. should do the labor and the county furnish the materials. The testimony shows that at any time this project could be terminated within 30 days. The commissioners with this provision in mind stated in their resolution: "Lumber and material for the said house to be purchased as needed." It will be observed that this is not a case where a general contractor was involved, who was to furnish all the labor and material and supervise the construction of the building. The W. P. A. approved the plan submitted and the house was built. During 1938 and 1939, $2672.60 and $3470.99, respectively, were expended by the county in carrying out its undertaking. It appears the commissioners had the aid of a competent farm superintendent, who personally contributed about $400.00 worth of material without any pay and did a portion of the work in connection with the erection of the house. The evidence shows that there were some 39 vouchers drawn and purchases were made from 23 different dealers. Each purchase and bill rendered was less than $500.00 and with but few exceptions there were separate vouchers and warrants for each bill.

In *Ruggles et al. v. Moore et al.,* 97 Pa. Superior Ct. 47, there was an unsuccessful attempt made to surcharge the county commissioners in making expenditures for materials and labor in connection with painting county bridges without advertisement, obtaining competitive bids, and awarding a contract as prescribed by the Act of May 31, 1919, P. L. 355. We there stated that the law required the commissioners to keep bridges in repair and that if they did so by awarding contracts then the act of 1919 must be followed. "They are not, however, required to award a contract in every case; they may do the work themselves—19 R. C. L. 1069. Here they purchased the paint and employed a painter to apply it." (p. 53.)

We do not find any evidence of criminality in these commissioners' purchasing for sums less than $500.00 the materials from time to time as needed.

In view of our conclusion that the law was not violated, it is not necessary to discuss the remaining questions raised by appellants.

The judgments entered in the court below to Nos. 45, 46, and 47, April Term, 1945, are reversed and the defendants discharged.