443 A.2d 295

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**ONE ELECTRO–SPORT DRAW POKER MACHINE, SERIAL NO. 258.**

Superior Court of Pennsylvania.

Argued Jan. 14, 1981.

Filed Dec. 18, 1981.

Reargument Denied April 13, 1982.

Petition for Allowance of Appeal Denied July 1, 1982.

Kemal A. Mericli, Assistant District Attorney, Pittsburgh, for Commonwealth, appellant.

Wayne V. DeLuca, Pittsburgh, for appellee.

Before SPAETH, SHERTZ and MONTGOMERY, JJ.

SHERTZ, Judge:

This is an appeal by the Commonwealth from the order of the Trial Court, entered on May 21, 1980, granting a Motion for Return of Property and to Prohibit Seizure. We affirm the order of the court below.

Harold O. Allen is the owner and operator of an establishment known as "Allen's Grill." For the entertainment of his customers, Mr. Allen maintained on his premises an electronic coin operated device known as an Electro-Sport Draw Poker Machine. On March 11, 1980, a Pennsylvania State Trooper obtained a warrant for Mr. Allen's arrest, charging him with a violation of 18 Pa.Con.Stat.Ann. § 5513 (Purdon 1973),[1] which prohibits the maintaining, etc. of a device used for gambling purposes. Upon learning of the issuance of the warrant, Mr. Allen voluntarily appeared before the issuing authority. The machine was then seized by the State Police. On May 14, 1980, by order of court, the caption was amended from *Commonwealth v. Harold O. Allen*, to its present form, reflecting the fact that the sole purpose of the proceeding was to determine whether seizure of the machine was lawful.[2] On Mr. Allen's filing of a Motion for Return of Property and to Prohibit Seizure, an evidentiary hearing was held. Following the hearing, the court held that the machine was not a gambling device per se and granted Mr. Allen's motion for return of the property. The Commonwealth appealed.

The Electro-Sport Draw Poker Machine is an electronic game which simulates five-card draw poker. The machine is operated by the insertion of one or more quarters. One quarter entitles the player to play one hand of poker. The deposit of more than one quarter does not affect the odds or

1. Act of Dec. 6, 1972, P.L. 1482, No. 334 § 1, eff. June 6, 1973.

2. The record does not reflect the disposition of the criminal action against Mr. Allen.

chance of winning, but merely increases the number of free games, the sole "reward" provided by the machine, if the player has a winning hand. Fifty-two (52) "cards" in the computer program are electronically shuffled by the machine and then dealt. The cards received by a player appear on a viewing screen. As in poker, the player may "stand pat", i.e. play the hand dealt, or draw cards by pushing a draw button and indicating which cards he wishes to discard.[3] The cards are not reshuffled prior to the draw. The odds are precisely the same as those in an ordinary game of poker. Since the machine is "solid state," the odds cannot be altered without replacing the integrated circuits that store the contents of the computer program for the Draw Poker Machine.

The sole issue raised on appeal is whether the court below erred in concluding that the Electro-Sport Draw Poker Machine is not a gambling device per se.[4] A machine is a gambling device per se only if it can be used for no purpose other than gambling. *Nu-Ken Novelty, Inc. v. Heller*, 220 Pa.Super.Ct. 431, 288 A.2d 919 (1972). In order to apply this test, an analysis of the term "gambling" is necessary. "Gambling" is not defined in the Pennsylvania Crimes Code, but historically and traditionally, gambling has been held to include three elements—consideration, reward and a result determined by chance as opposed to, and exclusive of, skill. A device or machine, to be a gambling device "per se", must meet all three criteria. *See In re Gaming Devices Seized at*

---

**3.** Points are scored by making various combinations of cards. A straight flush wins fifty skill points; four of a kind wins twenty-five points; a full house wins ten points; a straight wins five points, etc. The minimum winning hand is a pair of aces which wins one point. In regular draw poker players compete for the best hand amongst themselves and the reward is determined by the players during betting intervals. *See* 14 Encyclopedia Britannica 624 (1974).

**4.** Inasmuch as the Commonwealth does not contend that the machine was used by Allen or his patrons for gambling, in order for the property to be subject to confiscation and destruction the machine must be so intrinsically connected with gaming as to constitute gaming per se. *Nu-Ken Novelty Inc. v. Heller*, 220 Pa.Super.Ct. 431, 288 A.2d 919 (1972).

*American Legion Post No. 109*, 197 Pa.Super.Ct. 10, 176 A.2d 115 (1961); *In Re: Treasure Chest Amusement Device*, 9 D&C 3d 295 (1978).

The Commonwealth, contending as it does that the Electro-Sport Draw Poker Machine satisfies the definition of gambling as stated above and is therefore, *ipso facto*, a gambling device per se, bears the burden of establishing the existence of each of these elements. However, because the proceeding is in rem, the Commonwealth need not prove each element beyond a reasonable doubt, but rather by a preponderance of the evidence. *See Nu-Ken Novelty, Inc. v. Heller*, 220 Pa.Super.Ct. at 433, 288 A.2d at 920; *Commonwealth v. Landy*, 240 Pa.Super.Ct. 458, 362 A.2d 999 (1976).

It is conceded that a player must insert a coin to activate the machine in question and hence the first element, consideration, is present. However, Mr. Allen contends that both of the other elements, a result dependent on chance alone, and reward, are absent. We agree.

In order to conclude that a machine is a gambling device per se, it is necessary to find that successful play is entirely a matter of chance as opposed to skill. *See Nu-Ken Novelty, Inc. v. Heller*, 220 Pa.Super.Ct. at 433, 288 A.2d at 920; *In re Wigton*, 151 Pa.Super.Ct. 337, 344, 30 A.2d 352, 356 (1943). Webster's Third New International Dictionary defines chance as "something that happens unpredictably without discernable human intention or direction and in dissociation from any observable pattern, causal relation, natural necessity or providential dispensation." This court, in *In re Gaming Devices, supra*, focused on the degree of chance required to find that a machine is a gambling device per se. There the testimony was clear that the machine was purely a game of chance in which neither the odds nor the outcome could be influenced by the skill, or lack thereof, of the player. In the instant case, however, the converse is true. The cards ultimately played, and the result produced thereby, are, at least in part, within the control of the player, control which, of course, is affected by the order in which the remaining "cards" are subsequently "dealt."

A device or game does not involve gambling per se merely because an element of chance is involved in its play or because it may be the subject of a bet. Football, baseball and golf, as well as bridge, ping pong, billards or, for that matter, tiddledywinks, all involve an element of chance, yet the mere playing thereof is not gambling; betting on them is. *See Commonwealth v. Mihalow*, 142 Pa.Super.Ct. 433, 16 A.2d 656 (1940). Admittedly, someone might attempt to bet on the outcome of games played with the Electro-Sport Draw Poker Machine. This possibility, however, does not make the machine a gambling device per se.

In support of its argument that no skill is involved in the play of draw poker, the Commonwealth compares it to a slot machine where the object of the game, to match a variety of objects on a visual display, depends entirely on a random spin. We find the analogy to be inapplicable. Draw poker involves far more than a mere glance at the faces of cards, whether they appear on pieces of pasteboard, or on a viewing screen. Skill is exercised in choosing which cards to hold, in deciding which to discard, in considering whether to stand pat and in weighing the probabilities of drawing the desired card.[5] It is disingenuous to compare the Draw Poker Machine to a game in which the player merely inserts a coin and waits for bells, bars, cherries, oranges, etc., to match up. In playing the Draw Poker Machine, there are a variety of "hands" which can be sought and a varying range of probabilities of obtaining them through a draw. A player faces

**5.** Illustrations of the kinds of choices available to Draw Poker Machine players are found in R. F. Foster, *Foster's Complete Hoyle*, at 174 (1927):

> There is no rule to prevent his throwing away a pair of aces and keeping three clubs if he is so inclined; but the general practice is for the player to retain whatever pairs or triplets he may have, and to draw to them. Four cards of a straight or a flush may be drawn to in the same way, and some make a practice of drawing to one or two high cards, such as an ace and a king, when they have no other choice. Some hands offer opportunities to vary the draw. For instance: A player has dealt to him a small pair; but finds he has also four cards of a straight. He can discard three cards and draw to the pair; or one card, and draw to the straight; or two cards, keeping his ace in the hope of making two good pairs, aces up.

similar odds to any game of draw poker; he has a measure of control over the outcome and he is similarly dependent upon his individual skill. To successfully play the Draw Poker Machine, as in regular poker, the player must be familiar with the relative value of the various combinations which may be held and must also know the odds against improving any given combination by drawing to it. *See Foster's Complete Hoyle, supra* at 169. An expert witness, testifying in Mr. Allen's behalf, Mr. Kadane, Professor of Statistics at Carnegie Mellon University, found, after over a hundred plays, that it was possible to win four times as many games playing a "smart" strategy as opposed to a "dumb" strategy. Professor Kadane therefore concluded that success with Electro-Sport Draw Poker depends "a great deal" on the player's skill.

The assertion by the Commonwealth that the "maximum score that a player can achieve is preordained upon the deal" is correct, but irrelevant; it is equally applicable to any game of cards. Once the cards are shuffled and cut, they are aligned so that the maximum hand is predetermined, unless someone engages in improper dealing, but the extent to which that hand is subsequently achieved is dependent upon the skill of each player as manifested by his subsequent play. In the Draw Poker Machine, in particular, the element of skill comes into operation when the player calculates the odds and determines whether to draw cards, and if so, how many.

The argument that a player may occasionally win against the law of probabilities does not mean that the game does not require considerable skill. A peculiar combination of luck and skill is the *sine qua non* of almost all games common to modern life. It is hard to imagine a competition or a contest which does not depend in part on serendipity. It cannot be disputed that football, baseball and golf require substantial skill, training and finesse, yet the result of each game turns in part upon luck or chance. Can it be disputed that chance plays a role in determining whether a punt, which hits on the ten yard line, rolls into the end zone, goes

out of bounds at the one yard line or bounces backward toward the kicking team; whether a hard ground ball will take a hop into the shortstop's glove or will ricochet over his head into the outfield; or whether an errant golf ball which strikes a tree will rebound into the rough or onto the fairway? Even so cerebral a card game as bridge involves an element of chance, as anyone who has ever attempted to "finesse" a king will most assuredly agree.

As we have already indicated, the game of poker requires substantial skill for successful play. The fact that the game is played here with a computer rather than a deck of cards is not meaningful. Here the cards are shuffled as in any game of poker. That the cards exist in a computer memory and are displayed on a screen is irrelevant, particularly in a day and age when electronic computers daily take the place of more familiar forms of objects. To claim that this game is different in substance from a card game of poker is to ignore contemporary reality.[6]

Finally with respect to the issue of reward, we note that the only compensation for successful play of the Draw Poker Machine is free games, merely entitling the player to continue play without the further insertion of coins. Such compensation is insufficient to merit the reward requirement. *In re Wigton, supra.* In *Wigton,* the court considered the "free game" concept and held:

> Bearing in mind that penal laws must be strictly construed, we are not persuaded that the legislature intended a definition of gambling broad enough to make unlawful gaming in which the player, in addition to the pleasure of

---

**6.** Appellant also contends that the brief duration of the game, approximately fifteen seconds, is further evidence that the machine is a gambling device. *Laris Enterprises, Inc. Appeal,* 201 Pa.Super.Ct. 28, 192 A.2d 240 (1963). While in a proper case, brevity of play may tend to prove one of the elements required for a finding that a machine is a gambling device per se, we conclude that since there is ample evidence that skill is required to play Electro-Sport Poker, the fact that the playing time is brief provides little, if any, support for Appellant's position.

playing, stands to gain nothing but the right to play again without paying for it and the loser to lose nothing but the compulsion to let him play.

We hold that the "free game" feature does not warrant the destruction of the machines as devices used for the purpose of unlawful gaming.

*Id.,* 151 Pa.Super.Ct. at 342, 30 A.2d at 355.

In the instant case, the machine was equipped with a device that would vary the number of credits allocable to each coin. The machine also contained a "knock-off switch" and a meter to record the number of free games erased by the switch. The Commonwealth mistakenly relies on *In re Gaming Devices, supra,* for the proposition that such mechanisms are sufficient and competent circumstantial evidence of monetary reward. The machines there were multiple coin devices with concealed adjustment plugs allowing the owner to alter the odds unbeknownst to the unwitting player. Also the multi-coin aspect increased the odds. *Id.,* 197 Pa.Super.Ct. at 10, 176 A.2d 120. These features are not present here. The odds, for all practical purposes, cannot be altered; the multi-coin aspect of the Draw Poker Machine does not affect the odds. The knockdown button on the Draw Poker Machine can be construed as an item that is business related, as opposed to evidence of gambling use. It may be used to clear machines at days end or when a player tires of playing. This serves an accounting function and can assure the owner he is not being cheated. In other words, this button insures that a player must pay to play.

Although the Commonwealth established that the element of consideration exists, it has not established the required elements of reward and chance. The machine in question, not substantially different from the thousands of electronic amusement machines which have proliferated in stores and in arcades across this country today, is not a gambling device per se.

Accordingly, the order of the lower court is affirmed.