American Legion Post No. 51 Appeal.

Argued November 13, 1958; reargued December 10, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Louis C. Glasso,* with him *Henry Beeson,* and *Anthony Cavalcante,* for appellant.

*Frank P. Lawley, Jr.,* Deputy Attorney General, with him *George A. Lindsay,* Assistant Attorney Gen-

eral, *John D. Killian, III*, Deputy Attorney General, and *Thomas D. McBride*, Attorney General, for appellee.

*Richard P. Steward*, District Attorney, argued as amicus curiae.

OPINION BY HIRT, J., March 18, 1959:

On June 20, 1957 Pennsylvania State Police in concerted action, with the cooperation of local peace officers, seized 41 pinball machines at various restaurants, pool rooms, clubs, and the like, in Fayette County. The machines were all of the Bingo or "in-line" type of machine, manufactured or sold by Bally Manufacturing Company of Chicago. Two separate returns were made to the quarter sessions by Sergeant Trombetta of the State Police who was in charge of the raid. One return identified and described Bally pinball machines which, when seized, were actually being used for unlawful gambling. These machines were adjudged forfeited and were ordered to be publicly destroyed; the action of the court in that respect has not been questioned. We are concerned here with the rule granted on a petition accompanying a second return as to 24 of the same type of Bally machines alleged to be gambling devices per se, although not actually in use for that purpose at the time of the seizure. The lower court, after extensive hearings before it en banc, adjudged all of the machines ("listed and described in Exhibit A" of the return) forfeited as gambling devices and ordered their destruction. The proceedings were in rem under the Act of March 31, 1860, P. L. 382, §60, 18 PS §1445. Among the pinball machines identified in the return there were variations in type and with different names, but admittedly they all are fundamentally the same in character and logic of op-

eration; they all have the same basic features and all are *multiple*-coin "in-line Bingo type pinball machines." Most of the testimony, as well as the exhibits in evidence, had to do with the so-called "Bally Show Time" machines, the latest development of the type, and particularly with a Bally Show Time five cent machine number T 6887.

The appellant leans heavily on Wigton's Return, 151 Pa. Superior Ct. 337, 30 A. 2d 352 in arguing for a reversal in this appeal. That proceeding, under the same section of the 1860 Code as is here invoked, was in rem for the destruction of *single*-coin pinball machines. In that proceeding there was no evidence that the players were ever paid off in money or merchandise or that gambling among the players was permitted on the premises where the machines were seized. What a player could win by playing that type of single coin pinball machine, after the deposit of a coin, was the right to play additional free games and nothing more. And these machines did not have (in the language of Judge KENWORTHEY) ". . . the button or mechanical device for canceling the 'free games' nor the recording meter which were used, in the machines in Urban's Appeal, [148 Pa. Superior Ct. 101, 24 A. 2d 756] to facilitate their use for gambling . . ." In the *Wigton* case we held that the right to play a "free game" in itself was neither money nor "other property of value" within the meaning of §603 of the Act of June 24, 1939, P. L. 872 relating to gambling devices and their use, although we there recognized, as in *Urban's Appeal*, that the question was debatable under conflicting authorities in various jurisdictions. In all of the machines, involved in the present appeal, as with the amusement type of single coin machines before us in *Wigton's Return*, five balls were made available to the player upon the insertion of a single coin and, however extended the play,

the machines recorded the successes of the player only in terms of the number of free games won, but there the similarity ends.

On all the Bally machines the aim of the player in general is to light up 3, 4 or 5 numbers in a row; there are other ends to be attained, however, for the most part in special features set forth in Commonwealth's Exhibit No. 20. Harold L. Ergott, Jr., a Research Associate in the Department of Electrical Engineering at Pennsylvania State University, and a specialist in the field of electronics, when called by the Commonwealth, testified that from a study of the Bally Show Time machine he had made an analysis of the switch circuits and "the logic in general" of the performance of the machine in operation. His investigation took him into a highly complex field of electronics. Judge BANE, for the court en banc, based upon the testimony of this expert, has accurately described the Bally Show Time machine thus: "It stands about three and one-half (3½) feet high, and has an inclined horizontal playing field, under glass, dotted with numerous pegs, bumpers, rubber rings, spring bumpers, lights and twenty five (25) numbered holes, and one so called 'return ball' hole at the extreme front end of the playing field . . . To the rear of this horizontal playing field rises a vertical score board or back-plate, also under glass, which visibly records the progress of the game, as it is played, as well as the ultimate result. Both boards are attractively and artistically decorated. The vertical score board displays a large card or square, which contains a series of numbers, twenty-five (25) in all, corresponding to the numbered holes on the horizontal playing field. These numbers are joined or connected by vertical, horizontal or diagonal interlocking red, green and yellow lines. The large square is further subdivided into four (4) small squares, each con-

taining four (4) numbers, called 'magic squares'. At the bottom of the large square are four (4) subdivided horizontal numbers called the 'magic line'. The four (4) magic squares are identified by the letters, 'A', 'B', 'C' and 'D', and the magic line by the letter 'E'. On the front end of the frame surrounding the . . . [inclined] playing field and nearest the player are five (5) buttons, each correspondingly lettered 'A', 'B', 'C', 'D' and 'E'. If a player should be successful in illuminating any one or more of the magic squares, or the magic line, the pressing of the appropriate lettered button permits the player to rotate the four (4) numbers within the lighted square or line to a more advantageous position, thereby enhancing the possibility of his getting three, four or five numbers 'in line'. These in-line numbers must be . . . joined by the yellow, red or green lines, either vertically, diagonally or horizontally, and if so, a win is scored, much as in the game of Bingo." The opinion continues: "Surrounding this numbered square on the vertical score board are the so-called 'extra' game features, represented by appropriate figures. The object of these added features is to encourage the player to try for the opportunity of increasing his chances to win free games. These are scored by a 'free game' recording meter visible to the player in the upper left corner of the vertical score board. Thus the player knows, at any given time the total number of free games to his credit. Each such free game is equivalent in value, [in continuing the play] to the monetary unit required to operate the machine, and may be used, by pushing a button, for the same purposes which would otherwise be accomplished by the insertion of coins. Each time the player pushes this button, the free games are reduced by one (1) and the meter records this fact. Thereafter, he may continue to use his available free games [without the deposit of coins] until they are ex-

hausted, in which event the meter will have returned to zero. Should he desire to continue further play, he can then only activate the machine by the insertion of a coin, in the slot located on the front or player's end of the machine. Each of these multicoin pinball machines are so designed that they can be altered to take nickels, dimes or even quarters, by merely changing the chute device beneath the coin slot." The machines with which we are concerned were either 5-cent or 10-cent machines.

Mr. Ergott testified that the owner of the machine may control the degree of game difficulty to the player by the manual movement of "adjustment plugs". There are three sets of these adjustment plugs concealed from view of the player. One set controls the number of parallel circuits available for obtaining extra balls. A second set determines the number of possible paths that can be used to get corner advantages (a ball in each of the four corners gives the player the same number of free games won, as five in a line). The third set controls the number of parallel paths which supply voltage through the "reflex circuit" of the machine. In general the greater number of circuit-paths in operation, the greater the advantage to the player. By decreasing the number of parallel circuits normally operating, the chances of increasing one's score are diminished. This witness also found a "type of memory system built into the machine" in a "reflex unit". One relay in operation causes a switch at the back of the machine to rotate counter-clock-wise; but when games are being won a second relay takes over and reverses the switch in the opposite direction, thereby increasing the difficulty of gaining favorable odds and game advantage features. There is also a "control unit" in the machine which by rotating three cams in random action, destroys the possibility of a definite cyclic pattern of op-

eration, upon which a player could rely to his advantage. There are also "score unit discs" which by ingenious electronic devices control the odds on the machine. The first three coins should increase the odds as each of them is put into the machine. Thereafter, however, because of the random operation of the machine, whether a player obtains an increase in odds or other player advantage on deposit of coins, is dependent wholly upon chance. The insertion of additional coins does not guarantee to the player either an increase in odds or the advantage of extra features. So also, there is a "game proportioning circuit" which may change the degree of difficulty during actual play by relaying information "to a subsidiary circuit that will influence the operation of the other features in the machines".[1] Only one at home in the highly specialized field of electronics here involved, can comprehend the implications of the testimony of the experts in this proceeding.

After referring to the Control Unit, the Reflex Unit, the Mixer and Spotting Disc (making for random operation), and a Magic Square Feature Unit, the witness Ergott stated his conclusions in nontechnical language thus: "It has been determined that the operation of this machine is random in nature and is, therefore, not subject to operations of a cyclic form. However, the circuits are constructed in such a logical order as to insure a high degree of dependence between circuits which produce the 'game features,' i.e., odds, magic squares and selection features. Further it was found that the subject machine contains variable switching functions that may be controlled both automatically

---

[1] Reference may be had to the opinion of the lower court reported 16 Pa. D. & C. 2d 363 for a detailed description of the machines in operation and the interrelated functions of the electronic devices involved.

and manually. The variations of the switching functions are carried out by the following means: 1. *Adjustment Plugs.* The adjustment plugs constitute a semipermanent change in logic and are manually set to increase or decrease the game difficulty. 2. *Reflex Unit.* The reflex unit sets the game difficulty according to the ratio of games won to total games played. 3. *Game Proportioning Circuits.* The game proportioning circuits increase the odds of obtaining a new game advantage for each coin inserted into the machine as the game advantages increase. It is therefore seen that the machine has (1) a general difficulty established in part by the owner of the machine, (2) a variable difficulty based on the won-lost record of the machine, and (3) a game difficulty that opposes the obtaining of the maximum game advantage in any given game." Accordingly it must be apparent that the proprietor of an establishment can control the degree of game difficulty by the simple manual adjustment of four plugs; and the electronic devices, referred to as the "electric brain", automatically, as more and more coins are inserted in the machine, decreases the players chances of winning additional numbers of free games by increasing the hazards of play. The "logic" of automatic operation is not known to the player and he is not aware of the frustrating forces that are working against him.

We have stated that additional free games are the only reward from play, so far as indicated on the face of the machines. The "Visible Replay Meter", on the upper left edge of the backboard of the machine registers, for the information of the player at every stage of the play, the number of "replays" or free games which he has won. A "Total Play Meter" located on the left, inside the front end of the machines and not visible to the player, records the total number of games paid for by the insertion of coins. On Bally Show Time

machine number T 6887, in evidence, as well as on all the machines confiscated, there was a toggle switch or device underneath the machine on the right side, also concealed from view, referred to in the testimony as a "knockdown button". The purpose served by this mechanism is to wipe out the number of free games won on a machine as registered on the Replay Meter, without the playing of any of them. Quite obviously, it must be apparent that no player would allow the cancellation of the only evidence of his winnings from the replay meter, without being compensated by something in return. The third meter is a *concealed* "Replay Meter" located inside the cabinet on the right-hand side. Its sole function is to show the number of free games which have been *canceled* by means of the knockdown button. In our view the purpose of this meter cannot be other than to record with accuracy the amount of the payoff. More than any other element in the "logic" of these Bally machines, is the multiple-coin feature which, in conjunction with these three meters in operation, stamps all of the machines gambling devices per se.

There are other considerations which lead to the same conclusion: There can be no reward in terms of amusement from the mere insertion of coins into an unresponsive machine. If free games are all that can be won it is difficult to understand why there should be a difference in price charged for playing the machine. One cannot possibly get more amusement merely out of depositing 25 cents or even 10 cents instead of 5 cents, in the same type of machine if the reward is the same in all of them. From a reading of the present record we are convinced that the skill of a player in operating the machine has little effect on the ultimate result. The odds are continually against him. And there are evidences of electronic engineering in this case which

challenge and nurture the gambling instinct in a player and at the same time limit the amount that can be won. How substantial the profit may be to a proprietor exploiting the machines is suggested by the testimony of the witness Ann Pratt. Over an extended period she played one of the Bally type machines during her lunch period at Carmen's Restaurant, where two of the machines here involved were seized. She lost $86 during one day and she quit playing the machines entirely when her total losses amounted to $3,000. There is a factual false pretense in the tacit appeal of these Bally machines; they pretend to be on the level, but they are nothing of the sort. They are craftily designed, artfully constructed and ingeniously deceptive in their appeal, and in our opinion clearly are gambling devices per se.

We noted in *Wigton's Return*, supra, that the expression "gambling device" does not appear in §60 of the 1860 Act, as it does in §603 of The Penal Code of 1939. However we have held (*Commonwealth v. Kaiser*, 80 Pa. Superior Ct. 26) that "When the nature of the machine is shown to be such as fits them solely for an unlawful purpose, they become, in the language of some of the courts of other states 'outlaws'" and as such are subject to confiscation and destruction under the above section of the 1860 Act. Cf. also, §604 of the 1939 Code, 18 PS §4604. The settled policy of this Commonwealth, as declared in its legislation, has been opposed to gambling (*Plotnick v. Pa. P. U. C. et al.*, 143 Pa. Superior Ct. 550, 553, 18 A. 2d 542) in any form, and gambling by means of "play or device" was specifically made unlawful as early as March 26, 1762 by an enactment of the legislature on that date. 1 Sm. L. 246. The present proceeding has much in common with *Urban's Appeal*, 148 Pa. Superior Ct. 101, 24 A. 2d 756 on the facts, and is ruled by the holding of that

case on the law; cf. particularly page 113. Here as in that case, all of the machines listed in the return had been set up for public operation when seized; each of them was equipped with a "knockdown" button to cancel the meter record of free games won; the main purpose of that device, as indicated by the evidence and found by the court was to adapt the machine to the purpose of gambling; all of the machines seized were of the same type, and there was no basic difference between the present machines and those before the lower court on the other return, which, admittedly, were properly forfeited and destroyed because actually in use for gambling when seized. The courts in other jurisdictions have come to the conclusion that like machines under similiar, if not identical, legislation are gambling devices per se. Cf. *State v. Ricciardi*, 18 N.J. 441, 114 A. 2d 257; *State v. Bally Beach Club Pinball Machine*, 119 Vt. 123, 119 A. 2d 876. In the present proceeding the lower court as the judicial fact finder *reasonably* concluded that under all of the evidence the machines in question were gambling devices and were set up to be used for that purpose. Section 60 of the 1860 Code does not require a higher degree of proof. *Urban's Appeal*, supra, p. 113. The evidence supports the finding in this proceeding in rem that the machines in question are gambling devices per se. The order forfeiting the machines and directing their destruction, therefore was proper. Cf. *Mills Novelty Company's Appeal*, 316 Pa. 449, 175 A. 548.

Order affirmed.