## American Legion Post No. 51 Appeal.

Argued October 9, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

431

reargument refused December 17, 1959.

*James P. McArdle,* with him *James E. McLaughlin, Louis C. Glasso, Anthony Cavalcante,* and *Henry Beeson,* for appellant.

*Frank P. Lawley,* Deputy Attorney General, with him *George A. Lindsay,* Assistant Attorney General, and *John D. Killian, III,* Deputy Attorney General, for appellee.

*Richard P. Steward,* District Attorney, for amicus curiae.

OPINION PER CURIAM, November 24, 1959:

The order of the Superior Court affirming the order of the court below forfeiting the pinball machines in controversy and directing their destruction is affirmed on the opinion of Judge HIRT, reported at 188 Pa. Superior Ct. 480.

Mr. Justice McBRIDE took no part in the consideration or decision of this case.

Mr. Justice BELL and Mr. Justice MUSMANNO file separate dissenting opinions.

432

DISSENTING OPINION BY MR. JUSTICE BELL:

Seventeen pinball machines were seized by the Pennsylvania State Police at various establishments in Fayette County on June 20, 1957, including the American Legion Post No. 51. The Quarter Sessions Court sustained the position of the Commonwealth that these machines were gambling devices *per se* under the provisions of §60 of the Act of March 31, 1860, P. L. 382, 18 PS §1445. There was no testimony offered to prove that actual gambling took place on or in connection with these machines,* or that money or merchandise, or anything of value, had ever been paid to the winners. So far as the record shows, the only prize or reward which a winner received was *the right to play free additional games,* and this is not unlawful gambling. Furthermore, although it is easy to believe that the machines were frequently used for unlawful gambling, the evidence in this record does not, in my opinion, justify the majority's conclusion that these machines were manufactured or used and employed *solely* for the purpose of unlawful gambling.

Section 60, supra, provides: "It shall and may be lawful for any sheriff . . . to seize upon, secure and remove any device or machine of any kind, character or description whatsoever, *used and employed for the purposes of unlawful gambling*** . . . and to arrest . . . any person setting up the same . . . and the said court . . . if satisfied that such device or machine was employed and used for the purpose of unlawful gaming as aforesaid, shall adjudge the same forfeited, and order it to be publicly destroyed . . . ."

---

* 20 other machines which were actually used for gambling purposes at the time of their seizure, were validly confiscated by the police.

** Italics throughout, ours.

The question involved is whether these pinball machines—considering the details of their construction and the evidence in the case—are illegal *per se*. Neither gambling, nor unlawful gambling, nor "a device or machine used and employed for unlawful gambling" is defined in the Act. There is no doubt that if and when these or any other machines are actually used for unlawful gambling they are illegal and may be seized and confiscated by the Commonwealth.

It is Hornbook law that a Penal Statute must be strictly construed: Act of June 24, 1939, P. L. 872, 18 PS §5104; Act of May 28, 1937, P. L. 1019, Art. IV, §58, 46 PS §558; *Commonwealth ex rel. Varronne v. Cunningham*, 365 Pa. 68, 73 A. 2d 705; *Commonwealth v. Morgan*, 278 Pa. 395, 123 A. 337; *Commonwealth ex rel. Keiffer v. Ceraul*, 182 Pa. Superior Ct. 511, 128 A. 2d 187. Admittedly there is no evidence that these machines were used or employed for the purpose of unlawful gambling. Moreover, in my judgment, if these machines can be used either for pleasure *or* for unlawful gambling purposes, that is not sufficient to make them illegal *per se*, or to justify their confiscation and destruction by the Commonwealth. The evidence and the aforesaid authorities furnish a complete and decisive determination—adverse to the Commonwealth—of the question involved in the instant case.

In view of the fact that the argument and the various Court opinions have taken such a wide range, I shall discuss several of the points relied upon.

What is unlawful gambling, and what is a gambling device or machine within the meaning of §60? It may be helpful to also consider §604* of the Act of June 24,

___

* Section 605 of the Act of June 24, 1939, P. L. 872 provides: "Whoever sets up or establishes . . . any game or device of address, or hazard, at which money or other valuable thing *may* or shall be played for, or staked or betted upon . . . is guilty of a misdemean-

1939, P. L. 872 (The Penal Code) which provides: "Whoever makes, manufactures, or assembles any punch board, drawing card, slot machine, or any machine or device *used or intended to be used for gambling,* is guilty of a misdemeanor . . . ." Gambling itself is difficult to define; however, it involves the payment to the winner of money or something of value, and it is not limited to games or bets which are dependent *solely* upon chance; bets on games, or playing machines, etc., for money or something of value, even though the games or machines involve a combination of both skill and chance, and can be played for pleasure, may amount to unlawful gambling: Cf. *Wigton's Return,* 151 Pa. Superior Ct. 337, 30 A. 2d 352.

A few examples will illustrate my differences with the majority and additional reasons for my dissent.

A backgammon board can be used for pleasure or for gambling*—it is common knowledge that it is usually used for purposes of gambling, and in the latter event a few dollars change hands. A bridge table can be used for pleasure or for gambling; it is common knowledge that it is usually used for gambling. The players play for 1/40th of a cent to a penny a point, and ten cents to a few dollars change hands every evening. In each of these games a vast majority of the players are unskillful, and those who are inexperienced or unskillful loudly proclaim to uninterested companions that the winners won by chance, i.e., the roll of the dice or the luck of the draw, and that chance is far more important than skill. Take an extreme example:

---

or . . . . This section shall not be construed to apply to games of recreation and exercise, such as billiards, bagatelle, ten pins, etc., where no betting is allowed." In my judgment, by using "may", this section is unconstitutional.

＊ See also other examples given in the illuminating dissenting opinion of Mr. Justice MUSMANNO.

A golf course is built for recreation, exercise, air, companionship and (when you are playing well) for pleasure. Yet it is a matter of common knowledge that in nearly every golf match the players bet a dollar on the match, or a dollar Nassau,* or the drinks, and a few dollars change hands in the Clubhouse on the 19th hole. I am convinced that no one could successfully contend that all bridge tables, all backgammon boards, and all Clubhouses which have a 19th hole, are illegal *per se* and can be seized, confiscated and destroyed by the Commonwealth.

What disturbs me is that if we hold that these particular pinball machines are illegal per se, very many other tables, devices, machines and clubhouses, which can be used for recreation and pleasure, but are frequently used for some gambling, would have to be ruled illegal per se under The Penal Code of 1939.

For these reasons I dissent.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

I am opposed to gambling—intellectually, morally, and religiously. Moreover, the law of the Commonwealth prohibits gambling. Thus, no observation in this Opinion is to be interpreted as anything less than an unreserved disapprobation of gambling, which has nothing to recommend it but a wild desire to obtain lucre without labor, finance without fatigue, and quid without quo.

However, the condemnation of gambling, or any other evil for that matter, should not be so loosely applied that it strikes down perfectly legitimate and innocuous pastimes. Many bridge players play for money

---

* This does not include special golf tournaments following a Calcutta pool, or other auction.

but this would not justify the outlawing of bridge. Golf players sometimes make their game a little more dramatic by betting on the score but who would outlaw this healthful diversion because of a dollar or two which might change hands at the 18th hole? There is never a World Series but that baseball enthusiasts wager on the results, but to condemn and outlaw the World Series because fans bet on the scores, runs, hits, strikeouts and homeruns emerging from any particular game or all of them would provoke millions of Americans to their feet crying "Injustice!"

Yet, according to the argument advanced by the Commonwealth in this case, bridge, golf and the World Series could be enjoined. Counsel for the Commonwealth, in the oral presentation of his case, said that any device which is employed in a gambling operation may be confiscated and destroyed by the government. From the bench I put to him the proposition: "Suppose that bystanders bet on the number of Cadillacs which would pass a certain street corner at a certain time. Would you say that in such a situation, the Cadillacs would be amenable to legal forfeiture?" Counsel unabashedly replied that if the Cadillacs were used in the gambling operation, they would become illegal devices and therefore subject to condemnation and destruction. But how would the Cadillac-destruction, under those circumstances, differ from the maceration of playing cards, the ploughing under of golf links, and the razing of baseball stadia?

The pinball machines involved in this litigation could be gambling devices, and, if manufactured, sold, and operated for the sole purpose of unlawful gaming, would indubitably fall beneath the smashing hammer of gambling laws, but it is not enough to say that merely because, like the hypothetical Cadillacs, they *may* be employed for gambling, they should be reduced to scrap iron and tin.

The law of this Commonwealth, up until today's decision, forbade so purposeless a destruction of private property. The Superior Court said in *Wigton's Return*, 151 Pa. Superior Ct. 337, 343: "The legislative emphasis in Section 60 of the Act of 1860 is on *use and employment*, not the nature of the device. The expression 'gambling device' does not appear anywhere in the section although it does appear in Section 603 of the Penal Code. It condemns 'any device or machine of *any kind, character or description whatever*, used and employed for the purposes of unlawful gaming as aforesaid.' On the other hand, the authority to destroy them is limited to cases in which the court 'is satisfied that such device or machine was *employed* and *used* for the purpose of unlawful gaming as aforesaid.' There is nothing in the section which authorizes the seizure and destruction of devices MERELY ON THE GROUND THAT IT WOULD BE POSSIBLE TO USE THEM FOR UNLAWFUL GAMING." (Italics in original opinion, capitals mine.)

The evidence in the case before us merely shows that *it would be possible* to use the 17 seized pinball machines for gambling. In the entire printed record of 500 pages there does not appear the slightest evidence to show that they were *actually* used for gambling.

In *Commonwealth v. Kaiser*, 80 Pa. Superior Ct. 26, the Superior Court said: "When the nature of the machine is shown to be such as fits them solely for an unlawful purpose, they become in the language of some of the courts of other states 'outlaws.' "

Generally speaking, are pinball machines fitted so that they may be used *solely* for an unlawful purpose? The answer is an obvious negative. Pinball machines can be found in railroad stations, airport terminals, and amusement parks where they are manifestly played for amusement and pastime alone. The very expert called by the Commonwealth in this case testified that

while in the United States military service he often played pinball machines for pastime: "Q. But it was a pleasant way to spend your time? A. Yes, sir. Q. Did you win free games on the machine? A. Yes, sir. Q. Did you get paid off? A. No, sir. Q. Would it have been possible to get paid on that device? A. I suppose so. Q. You could have gambled with a friend of yours, could you not? A. I could have gambled on it. Q. Did you ever see anyone paid off at the PX? A. No, I didn't."

This same Commonwealth expert testified, contrary to the theory advanced by the Commonwealth, that skill may be developed in playing pinball machines: "Q. Have you watched those machines being played? A. Yes, I have. Q. Have you seen a difference in the skills of various players? A. Yes, they differ. Q. How many times, Professor, would you say you have played pinball machines? A. I wouldn't have any idea, sir. Q. One hundred times? A. Maybe five hundred times."

The Majority has adopted the Opinion of the Superior Court in this case as its own, so that, therefore, I will refer to it as the Majority Opinion. The Majority Opinion affirms the judgment of the lower Court, ordering the destruction of 17 pinball machines, on the basis that they are gambling devices per se, but it fails to specify how and why they are such devices. Without intending any disrespect, I would say that much of the Majority Opinion reads as if it might be a technical description of a highly intricate complex electronic space-traveling rocket. It speaks of parallel circuits, reflex circuit, voltage, circuit-paths, reflex unit, three cams, random action, cyclic pattern, score unit discs, electronic devices, spotting disc and an electric brain! After using this kind of language, the Majority admits, almost apologetically, that "Only one at home in the highly specialized field of electronics here in-

volved, can comprehend the implications of the testimony of the experts in this proceeding."

If the Majority does not understand what it is writing, how can it expect police officers throughout the State to be guided by its decision? A judicial decision should be a searchlight before it becomes a guillotine.

Although the proceedings in this case determine the fate of only 17 machines, the decision will be used throughout Pennsylvania as a death warrant for thousands of other machines, whose value, on a conservative estimate, could easily surpass five million dollars.* Should this Court condemn private property so summarily and so ambiguously? Instead of entangling the law in an inextricable thicket of polysyllabic technological nomenclature, should it not specify in words of monkey wrench simplicity just what is or are the gambling features of the pinball machines which doom them to extinction?

The Act of June 24, 1939, P. L. 872, 18 P.S. 4605, provides: "Whoever sets up or establishes or causes to be set up or established any game or device of address or hazard, at which money or other valuable thing may or shall be played for, or staked or betted upon . . . is guilty of a misdemeanor."

The player of a pinball machine does not and cannot collect money from the machine. The Commonwealth expert admitted that in his examination of the machines in custody he did not find anything which would give to the player "any money, coins or tokens, or any other objects that are redeemable in either cash or merchandise." What, then, can the player win? He can win the right to play extra games without paying for them. But such an authorization or privilege is not a "valuable thing" within the meaning of the statute.

---

* It was later ascertained that the total value of these machines would amount to $17,000.00!

The Superior Court has spoken to this very effect: "Bearing in mind that penal laws must be strictly construed, we are not persuaded that the legislature intended a definition of gambling broad enough to make unlawful, gaming in which the player, in addition to the pleasure of playing, stands to gain nothing but the right to play again without paying for it and the loser to lose nothing but the compulsion to let him play. We hold that the 'free games' feature does not warrant the destruction of the machines as devices used for the purpose of unlawful gaming." (*Wigton's Return*, supra, page 343.)

But, it is argued by the Commonwealth, the machines are equipped with certain "features" which, of themselves, make the machines gambling devices. One of those accused "features" is the so-called knock-down button, the manipulation of which cancels free games won by the player up to that time. The Superior Court has said that such a contrivance is not enough to illegalize the machine: "We hold that the mere fact that these machines are so constructed that it is possible to cancel some of the 'free games' without playing them is not, by itself, sufficient evidence to support a finding that they were used for the purpose of unlawful gaming." (*Wigton's Return*, supra, p. 346)

Although the Commonwealth sees in the knock-down button sinister implications, it cannot be denied that the erasing button can serve perfectly lawful functions. If a player, for any reason, leaves the machines without playing all the games to which he is entitled, the proprietor, by means of the knock-down button, clears the machine so that the succeeding player may start afresh.

I believe that *Wigton's Return* controls in this appeal. The Majority attempts to distinguish *Wigton* from the present case, but the attempted contrasting,

so far as legal principle is concerned, is like drawing a distinction between peas in the same pod. The Majority says: "In that proceeding [the *Wigton* case] there was no evidence that the players were ever paid off in money or merchandise or that gambling among the players was permitted on the premises where the machines were seized." The same situation obtains in the case at bar.

The Majority says: "What a player could win [in the *Wigton* case] by playing that type of single coin pinball machine, after the deposit of a coin, was the right to play additional free games and nothing more." *That* is all the player can win in the machines which are the subject of this lawsuit, namely, the right to play additional free games; nothing more. The fact that after the games have been played, the score may be used as a basis for the payment of money does not make the machine illegal any more than the exchange of money between players at the end of a golf game metamorphoses golf into illegality. Because gamblers bet on a horse is no excuse for shooting the horse. A horse can be used for purposes other than circling a race track to the accompaniment of cheering and groaning money-betting winners and losers.

The grievous fault in the Majority Opinion is that it fails to differentiate between machines which are evil *per se* and those which may become evil by use. It is to be remembered that these proceedings are in rem. The machines themselves are the subject of the litigation; they are the ones that stand to be annihilated if they are proved to be gambling devices per se. A gambling machine *per se* is one which, without human intervention, deprives the player of money, or valuable thing, as the result of mere chance, or, worse yet, as the result of mechanical planning, works odds against him.

The slot machine notoriously falls within such a category. The person who puts coins in a slot machine looks hopefully for a shower of coins in return. The machine is so contrived, however, that in order to refresh the occasional player with a monetary shower, many others must suffer the Sahara of an unrelieved drought. Thus, the slot machine, well-termed a "one-armed bandit", is subject to condemnation and execution because it is built for the very purpose of deceiving the innocent, robbing the unwary, and emptying the pockets of the conceited gambler who thinks himself smarter than nuts, bolts, screws and pistons all coordinating to beat him. The slot machine player has but one purpose and that is to gain money. The pinball player may or may not be interested in gaining money. He may actually play merely for entertainment, pastime and enjoyment, just as the Commonwealth expert admitted he had done for some five hundred games.

The Commonwealth detects gambling in the meters with which the pinball machines are equipped. There is no doubt that these meters can be utilized for the purpose of determining whether a player should receive money from the proprietor or lessee, but they may also be bookkeeping devices to keep the record straight as to whether the player is paying for his games. Since the machine is, in its nature, a competitive one, (the player seeking to win a score which will entitle him to free games, and the machine itself contesting to prevent such free games), a scorekeeper, mechanical or human, is inevitable. When the proprietor of the machine comes to collect the money in the coin box he must know how many games have been played in order to make certain that the machine has not been tampered with. Thus, a meter or a number of meters, are indispensable in ascertaining how many games have been paid for, and how many became gratuitous through the skill of the player.

The Majority Opinion says: "More than any other element in the 'logic' of these Bally machines, is the multiple-coin feature which, in conjunction with these three meters in operation, stamps all of the machines gambling devices per se."

After this portentuous pronouncement the Majority Opinion moves on to something else. It does not say *why* the multiple-coin feature makes the pinball machine a gambling device *per se*. There is nothing inherently wrong about multiple coins. One deposits multiple coins in a pay telephone, one inserts multiple coins in a phonograph-playing machine, one presses multiple coins into candy and cigarette-vending machines—all legally. Thus, the phrase "multiple-coin" does not conjure up anything sinister, anything hydra-headed and Gorgonian which of itself calls for decapitation. The statement by the Majority on multiple-coins is not judicial, but legislative. But, when the law of Pennsylvania is to categorically condemn multiple-coin devices, that law must be pronounced by the Legislature, not by the Courts.

The fact that the multiple-coin machines *may* be used for gambling purposes cannot ipso facto make them unlawful gaming. As Judge KENWORTHEY said: "It may be that the proprietors of the machines involved in this case will use them for unlawful gaming. But even if we were fearful of that development we have no power to make a broad, sweeping, prophylactic rule; *the legislature has given us no such authority.*" (*Wigton's Return*, supra, p. 345) (Emphasis supplied)

The Majority finds no amusement in pinball machines. Neither do I, but I would not condemn them for that reason. There are many games which absorb the attention of mankind which leave me quite indifferent. Pool playing to me is the pedestrianism of a caged bear, card playing is a bore, quoits dull, tug-of-war infantile, ping pong an agitated checkers game.

444

But there was a time when I found all these pastimes interesting and there are many who would rather sit on the edge of their chairs watching the unfoldment of a thrilling card game of solitaire than to follow a shooting, yelling Westerner on television. This is all a matter of taste and inclination, and we have no authority whatsover to interfere with the pastime of the people. All these games may become the media for gambling, but they are not, for that reason, to be thrown against a blank wall and executed like the fateful Cadillacs which drew the fire of Commonwealth's counsel at the oral argument.

The Majority says: "There can be no reward in terms of amusement from the mere insertion of coins into an unresponsive machine."

This is about as platitudinously dreary a statement as one would not want to encounter in a judicial opinion. Of course, there is no amusement from the "mere insertion of coins into an unresponsive machine." There is no reward either from dropping coins in a telephone box but there can be a rewarding experience in the conversation which follows. There is no reward in paying money at a box office, but there is a rewarding experience in the theatrical performance which is seen.

The Majority, in signing the death warrant of the 17 pinball machines, says: "They [the pinball machines] are craftily designed, artfully constructed, and ingeniously deceptive in their appeal, and in our opinion clearly are gambling devices per se." This imparts no enlightenment whatsoever to the pinball machine owner as to what is wrong about the machine. To say that machines are craftily designed and artfully constructed means nothing, so far as deciding the issues in this lawsuit is concerned. Television sets are craftily designed and artfully constructed. Then, to say that the pinball machines are "ingeniously deceptive" is about as informative to the public as to say that sleight-

of-hand is ingeniously deceptive. Many innocuous devices in amusement parks, carnivals and on boardwalks at seaside resorts are made up of the most ingeniously deceptive and complicated machinery in order to offer divertisement and delectation to children and grown-up juveniles, but this does not make them *mala in se.*

In summing up I would say the following. A pinball machine in itself is not a gambling device. That much must be admitted by the Commonwealth. A normal pinball machine is as innocuous as bingo which, in some ways, it attempts mechanically to reproduce. Of course, the machine, like any other apparatus, device, game, sport, or diversion, may be turned into a gambling instrument. The person who employs that gambling instrument for gaming may be prosecuted under the State gambling laws. The instrument, however, may not be forfeited and destroyed unless it cannot be used for any purpose other than gambling.

The Majority says that the pinball machines in this litigation are gambling devices but it fails to specify how and why they are gambling devices, which subjects them to execution. *The record utterly fails to show that these machines were ever used for gambling.*

We thus come to the inevitable conclusion that the Majority has, after a certain amount of technological discussion, arbitrarily condemned them to destruction. I believe that the owners and lessees of similar machines throughout the Commonwealth are entitled to know wherein the machines are illegal and this explanation should be given, in language which will enable them to make such adjustments as will bring the pinball machines (which are intrinsically harmless) into the realm of legality. The proprietors of five million dollars worth of private property are entitled at least to this. Because the Opinion of this Court does not do this, I must dissent.