Commonwealth of Pennsylvania *v.* 9 Mills Mechanical Slot Machines, etc. Miles Angelo, Appellant.

Submitted on briefs, October 5, 1981, to President Judge CRUMLISH and Judges ROGERS and CRAIG, sitting as a panel of three.

*Thomas R. Ceraso,* with him *Donald P. Tarosky,* for appellant.

*Albert M. Nichols,* District Attorney, with him *John F. Dent,* Assistant District Attorney, for appellee.

OPINION BY JUDGE ROGERS, November 16, 1981:

Miles Angelo has appealed from an order of the Court of Common Pleas of Westmoreland County ordering the confiscation and destruction of eleven gambling devices owned by Angelo and the forfeiture to Westmoreland County of monies contained therein, pursuant to Section 1 of the Crimes Code, 18 Pa. C. S. §5513(b) (Section 5513(b)). We affirm.

On January 13, 1979, the B.P.O.E. Elks Club of Mount Pleasant (Club) held a "Las Vegas Night." The event was open to any member of the public who paid a $1.00 admission charge. At approximately 11:15 p.m., members of the Pennsylvania State Police, in plain clothes, paid the admission fee and entered the Club. The officers remained in the Club for approximately one half hour, during which time they observed nine (9) slot machines, all of which were being played by patrons, one (1) Bally Deluxe Gold Cup machine (Gold Cup) and one (1) Electronic Draw Poker machine (Draw Poker). The officers, deeming these machines to be gambling devices, then confiscated them, along with $420.40 contained in the machines.

On April 23, 1979, the district attorney of Westmoreland County filed a petition to destroy the confiscated machines and to forfeit the monies contained therein. The petition was subsequently amended in minor detail and, on March 7, 1980, Angelo filed an answer to the petition. A trial was held after which the lower court issued an opinion and order holding that all of the machines were unlawful gambling devices per se and directing that the machines be destroyed and the monies contained therein forfeited pursuant to Section 5513(b). This appeal followed.

Angelo first contends that the Commonwealth failed to prove that its search of the Club was based upon probable cause, as required by the fourth amendment of the United States Constitution.[1] This argument is without merit. In *Commonwealth v. Weimer,* 262 Pa. Superior Ct. 69, 396 A.2d 649 (1978), two plain clothes state troopers, without either search or

---

[1] The fourth amendment's protection against unreasonable search and seizures is applicable to confiscation proceedings. See *One 1958 Plymouth Sedan v. Commonwealth,* 380 U.S. 693 (1965).

arrest warrants, entered a private club on two occasions. The club's entrance was a locked door activated by a buzzer system. The door contained a one-way mirror. The officers merely pressed the doorbell and, although they were not members of the club, they were admitted without question. While in the club, the officers observed various gambling paraphernalia and subsequently confiscated the gambling equipment and arrested the club's president and his son for possession of gambling devices. The defendants moved to suppress the confiscated gambling equipment on the ground that the police officers' unannounced entry into a private club, without a warrant, constituted an unconstitutional infringement of the defendants' right of privacy. The lower court granted the defendants' motion to suppress. On appeal, the Superior Court stated that the essential issue of the case was

> whether the interior of the [defendants'] club was a constitutionally protected area and whether the officers had a legal right to be inside the premises when they observed the gambling paraphernalia and affected the arrests. If they had such a right, then their observation of the gambling paraphernalia was sufficient to form probable cause to arrest and seize the immediate evidence.

262 Pa. Superior Ct. at 74, 396 A.2d at 651. The court held that the lax enforcement of the club's purported security measures designed to insure the privacy of the club negated any reasonable expectation of privacy on the part of the defendants and that the interior of the club thus was not a constitutionally protected area. The court further held that the club's admittance of the officers with little regard to their identity constituted an invitation, giving the officers a legal right to be in the club. Accordingly, the court

reversed the lower court's order of suppressing the gambling paraphernalia.

In the instant case, the Elks Club's claim to constitutional protection is even weaker than that of the defendants in *Weimer*. Here, not even a locked door was present to bar the officers' entrance into the Club. The Club held Las Vegas Night open to any member of the public who paid the $1.00 admission fee and demonstrated no concern for the identity of its patrons. Therefore, here, as in *Weimer*, the interior of the Club was not a constitutionally protected area and the officers had a clear legal right to be inside the Club. The officer's observations inside the Club then provided sufficient probable cause for them to seize the gambling devices pursuant to Section 5513(b).

Angelo next contends that gambling devices cannot be seized pursuant to Section 5513(b) unless a violation of Section 5513(a) is shown. Angelo bases this contention upon the language of Section 5513(b), which states in pertinent part that ''[a]ny gambling device possessed or used in violation of the provisions of subsection (a) of this section shall be seized and forfeited to the Commonwealth.'' Section 5513(a) provides, *inter alia,* that it shall be a misdemeanor of the first degree to ''intentionally or knowingly . . . maintain [], . . . [] [or] lease[], . . . any . . . slot machine or device to be used for gambling purposes, except for playing cards.'' The undisputed evidence in this case reveals that Angelo did maintain and lease the nine slot machines and the two other devices, which were used for gambling purposes, to the Club. Therefore, the slot machines and the two other devices were ''gambling devices possessed or used in violation of subsection (a).'' Moreover, the fact that Angelo may or may not have been convicted under Section 5513(a) is irrelevant because

the legality or propriety of the seizure is not dependent upon the conviction of the owner under Section 5513(a). *See Schuettler v. Mauer,* 159 Pa. Superior Ct. 110, 46 A.2d 586 (1946).

Finally, Angelo contends that the lower court erred in holding that the Gold Cup machine and the Draw Poker machine are gambling devices. Angelo recognizes that three elements must exist for a device to be deemed a gambling device per se—consideration, chance and reward—and that the device can have no use other than for gambling. *See, e.g., In Re Gaming Devices Seized at American Legion Post No. 109,* 197 Pa. Superior Ct. 10, 176 A.2d 115 (1961). *(Am. Legion No. 109).* Angelo claims, however, that the Gold Cup machine lacks a reward and that the Draw Poker machine lacks chance and a reward.

The Gold Cup machine is similar to a slot machine, albeit electronic and with certain added features. Upon insertion of a dime, the player presses a lever which causes the machine to display various combinations of three symbols such as plums and oranges. The machine also allows a player to choose to hold some symbols over to the next game. Different pay-offs are made for different combinations. The machine also allows a player who has obtained a winning combination to continue playing with a chance to increase his or her pay-off. A game takes approximately ten seconds. The pay-off ostensibly consists of free games, although the machine can be easily set up for cash pay-offs. In fact, cash pay-offs were made by the Club when a player obtained a certain number of free games.

The interior of the Gold Cup machine contains two meters hidden from the player's observation. One meter records the total number of coins inserted into the machine. The second meter records the total

number of coins paid out, or, in this case, the total number of free games played. Unplayed free games can also be "knocked-off" the machine without being recorded upon the total coins-out meter.[2]

In *Am. Legion No. 109, supra,* machines substantially similar to the Gold Cup machine were held to be gambling devices per se, based upon the following factors: 1) all the machines operated entirely by chance, with no element of skill involved over the outcome; 2) the denomination of coins used to activate the machines could be varied by the owner; 3) free games could be cancelled from the machines; 4) the machines contained meters to calculate the number of free games knocked-off the machine; 5) the owner of the machines could adjust the machines to increase or decrease the player's chances of winning; 6) the machines could be easily converted into actual coin pay-out machines; 7) the machines were complete within themselves and neither the operator nor anything else could decide whether or not free games were won; 8) the machine permitted the operator to hold a part of a previous play to be used in the next game; and 9) the period required to play the game was extremely short.

Although factors 2 and 5 listed above are absent in the Gold Cup machine, it is readily apparent that the elements of consideration and chance are present. However, is the element of reward present? We be-

---

[2] The expert testimony in this case reveals that the owner of a gambling machine and the owner of the establishment in which the machine is placed typically split the profits obtained from the machine. The profits are calculated by subtracting the number of pay-offs recorded, in this case, free games, from the total number of coins inserted into the machine. The knock-off feature allows used pay-offs, *i.e.,* unplayed free games, to be removed from the machine without having these pay-offs recorded, which would effect a reduction of profits.

lieve, as did the lower court, that the element of reward is present in the case of the Gold Cup machine. Although a free game in and of itself is not necessarily a thing of value so as to constitute a reward, *see Wigton's Return,* 151 Pa. Superior Ct. 337, 30 A.2d 352 (1943), a free game may constitute a reward under certain circumstances. *Am. Legion No. 109, supra.* The ability to knock-off free games, the presence of meters to enable the owner to determine how many games were knocked-off, the ability of a player to hold a part of his previous play over to the next game in order to increase his or her chance of winning a higher pay-off on the next game, and the extremely short playing time involved compels the conclusion that the reward of a free game constitutes a thing of value. *See Am. Legion No. 109 supra; In Re Return of Trombetta,* 188 Pa. Superior Ct. 480, 149 A.2d 483, *aff'd per curiam,* 397 Pa. 430, 156 A.2d 107 (1959), *appeal dismissed,* 363 U.S. 720 (1960). Accordingly, we agree with the court below that the Bally Deluxe Gold Cup machine is a gambling device per se.

A single game on the Draw Poker machine may be had for a quarter. However, a player can put up to eight quarters in the machine at once, and thereby increase his or her pay-off, although the odds of winning remain the same. After inserting the coin, or coins, the player pushes a button which causes five facsimiles of playing cards to appear on a screen. The player then may choose to discard up to five cards and receive an equal number of new cards in an effort to make the best possible poker hand. Different poker hands are rewarded with varying amounts of skill points; for example, a pair of aces awards one skill point; a flush awards eight skill points and a straight flush awards fifty skill points. A game lasts approximately ten seconds. Free games are awarded when a player obtains the requisite num-

ber of skill points. Again, the Club made actual cash pay-offs to players who obtained a certain number of skill points.

The Draw Poker machine contains one meter which registers when there is a winning combination of skill points awarded. The machine also has a knock-off feature. Furthermore, the machine can be set to provide from one to ten games for a quarter, thus having the same effect as a mechanism designed to allow the machine to provide one game for different denominations of coins.

The element of consideration—the insertion of a coin—is clearly present in the Draw Poker machine. We also believe the element of chance to be present, for, although some knowledge of the odds of obtaining various combinations of cards would enable a player to maximize his or her potential for winning, the outcome of the game is dependent entirely upon the electronic fall of the cards. Finally, the ability of the owner to knock-off games, the presence of a meter to record only free games cancelled, the ability to adjust the machine to provide for various costs per game and the extremely short playing time involved all demonstrate that the free games awarded are a thing of value constituting a reward. *See Am. Legion No. 109, supra; Trombetta, supra.* Thus, the Electronic Draw Poker machine is a gambling device per se.

Finally, we note that even if the Gold Cup machine and the Draw Poker machine were not gambling devices per se, they would still be subject to confiscation and forfeiture under Section 5513(b). The undisputed testimony in this case, particularly that of the Club's officers, shows that actual cash pay-offs were made on the outcome of these machines. Thus, these machines were in fact maintained, leased and used for gambling purposes in violation of Section

5513(a). This fact alone renders them liable to confiscation and forfeiture under Section 5513(b). *See In Re Trombetta,* 197 Pa. 430, 156 A.2d 107, 108 (1959) (BELL, J., dissenting).

Order affirmed.

## ORDER

AND Now, this 16th day of November, 1981, the order of the Court of Common Pleas of Westmoreland County No. 3719 of 1979—In Rem is affirmed.