SIDNEY ROSENKRANZ AND RICHARD FERNANDEZ, PLAIN-
TIFFS-APPELLANTS, v. JOHN F. VASSALLO, JR., DIRECTOR
OF THE STATE DIVISION OF ALCOHOLIC BEVERAGE CON-
TROL, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 20, 1983—Decided January 25, 1984.

Before Judges MICHELS, KING and DREIER.

*Richard L. Gruber* argued the cause for appellants (*Mayer and Mayer,* attorneys; *Richard L. Gruber,* of counsel and on the brief).

*Carol L. Widemon,* Dep. Att'y Gen., argued the cause for respondent (*Irwin I. Kimmelman,* Att'y Gen. of New Jersey, attorney for respondent; *Deborah T. Poritz,* Dep. Att'y Gen., of counsel, *Carol L. Widemon* on the briefs).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Plaintiffs Sidney Rosenkranz and Richard Fernandez appeal from an administrative action of John F. Vassallo, Jr., Director of the New Jersey Division of Alcoholic Beverage Control ("Division"), contained in Bulletin No. 2430, Item No. 3, issued on March 31, 1983, which prohibited the placing of certain video poker and other similar machines on liquor licensed premises. Item 3 of the Bulletin provided:

### 3. NOTICE TO LICENSEES—PROHIBITION OF VIDEO POKER AND OTHER SIMILAR MACHINES ON LIQUOR LICENSES PREMISES

Numerous requests have been received from law enforcement officials, municipal clerks, retail-licensees and manufacturers of video machines seeking Division policy on the placement of Video Poker, Black Jack, Dice, Hi-Low and similar gaming type video machines on liquor licensed premises. While the proliferation of numerous variations of machines that involve traditional utilization of card and dice games is recent, the subject matter has been part of Division regulation since October 11, 1934 (*then Rules 7 and 8 of State Regulation No. 20*).

Current Division Regulation, *N.J.A.C.* 13:2–23.7 prohibits gambling of any kind on liquor licensed premises. The possession on licensed premises of "(any) slot machine or device in the nature of a slot machine which may be used for the purpose of playing for money or other valuable thing" is also prohibited. *N.J.A.C.* 13:2–23.7(a)(4). By operation of this Regulation, these machines are prohibited.

In addition, while a draw poker or similar type machine may be programmed so that it does not itself pay off anything of value based upon a participant's success or failure in connection with the operation of the machine, the Division has taken the policy position that such machines offer marginal amusement value in that there is a basic lack of need for any type of coordinative skill by the player. Such a machine is so susceptible to gambling between a participant and an observer that the Division has rejected their suitability in a liquor licensed premise. So too, the machine may be reprogrammed upon placement to award prizes itself, or the scores or points attained by a player may become a basis to award money or "other valuable things" by the licensee.

Thus, the video machines which resemble games of cards, dice, roulette, etc. are not permitted in liquor licensed premises in New Jersey.

Plaintiffs each own a separate company engaged in the business of placing vending and game machines owned by them in various business establishments under agreements with the owners of such businesses. More than 75% of plaintiffs' businesses consist of placing such machines in liquor licensed establishments.

The record reveals that during the period from August of 1982 to March of 1983, the Division received a number of requests from, among others, representatives of interested alcoholic beverage and amusement game associations, individual alcoholic beverage licensees and manufacturers of video gaming machines for information regarding the legality of placing video poker, dice, blackjack and similar machines ("Video Poker Games") in liquor license establishments. Responding to an inquiry made by Mary E. Rahmig, executive director of the New Jersey

Licensed Beverage Assn., Inc., Robert J. Pinard, Deputy Director of the Division of Alcoholic Beverage Control, advised Ms. Rahmig by letter dated August 16, 1982 that the Division would:

[C]ontinue the Division policy which prohibits amusement game devices on liquor licensed premises which resemble traditional games of gambling. Some of the more common type games include electronic poker, blackjack, dice or any type of device which resembles a slot machine.

On January 27, 1983, William J. Treger, Jr., the Bureau Chief of the Division's Bureau of Amusement Games, responded to a letter from Art Warner of Betson Enterprises, stating that video poker games "are legal as long as they are used for entertainment purposes only." However, Chief Treger in his response also cautioned that the operator was not allowed to either buy back or erase credits, and that if this was done the machine would be considered a gambling device and charges would be brought against his license. Thereafter, Director Vassallo on February 10, 1983 responded to second inquiry from Ms. Rahmig, again disapproving the placing of video poker games in liquor licensed premises. As the result of this February 10th response, Chief Treger wrote Art Warner a second letter, dated March 8, 1983, stating:

After many complaints about gambling taking place on the outcome of the "hands" on video poker machines, the Director [of the Division of Alcoholic Beverage Control] has determined that these machines will no longer be allowed in liquor licensed premises.

The game in and of itself is not a gambling device, but when put into the hands of any person or persons, the natural tendancy is to gamble, therefore we cannot allow them.

In view of these varied responses, by letter dated March 25, 1983, the Joseph Katz Company, a public affairs counsel representing the Amusement and Music Operators Association, wrote the Attorney General's office requesting a definitive opinion as to the legality of video poker games. The Attorney General, by letter dated March 30, 1983, stated that the Director's letter of February 10, 1983 set forth the proper position of the Division. The conflicting opinion of Chief Treger, set forth in his earlier January 27, 1983 letter, was characterized by the Attorney

General as merely "an off-the-cuff view ... not expressive of the policy of the Division."

Finally, on March 31, 1983 the Director issued the Bulletin challenged on this appeal. The Director pointed out that pursuant to *N.J.S.A.* 5:8–78 *et seq.* he is also the State Commissioner of Amusement Game Control and, as such, all applications for certification of games for amusement parks and the like are submitted to him. In this capacity he received brochures, specifications and information concerning video poker games which, in part, formed the basis for the position set forth in the March 31 Bulletin, and which are part of the record on this appeal. The Director maintains that at the time of the issuance of the Bulletin he had knowledge of 13 investigations by the State Police ABC Enforcement Bureau of alleged payouts by liquor licensees for points won by persons playing video poker and similar games. In fact, the Director claimed that during one of the investigations the licensee's bartender admitted that he paid $5 for each total of 20 points won by patrons on the two "Joker-Poker" machines on the licensed premises.

From a review of the brochures submitted to the Director, it appears that the general functioning of the video poker machines described therein is as follows: The player deposits a coin or coins, which are registered on the credit counter. The value of the coins required to register a credit and the maximum number of coins which may be deposited (and credits which may be registered) are determined by the particular equipment involved. The player may wager as many of these credits as he desires on a particular hand, subject to a limit determined by the machine. (The standard limit is 30). The cards are shuffled electronically, and the player is dealt five cards, either face up or face down, depending on the machine. Like a traditional deck of cards, there are 13 cards of each of 4 suits, for a total of 52 cards. The games have the same "win format" as traditional five card draw poker. Upon being dealt his "hand", a player may elect to "stay", *i.e.* keep his original cards, or to "discard" any or all of these original cards and "draw" replacement cards.

Because the cards are constantly reshuffled, it is possible to "draw" a card which has just been discarded. Different winning hands are rewarded with varying amounts of "skill points," based upon the rank of the hand. As more coins are inserted, the number of skill points awarded for each winning combination and thus the number of credits won increases. The lessor, by setting the machine, may determine the lowest winning hand. The percentage returned to the player is determined by the machines "payout level", which is set by the lessee. If at the end of a hand a player possesses a winning combination, he generally has the option of either having the amount of points won credited to the credit counter, where they can then be bet on the following game, or of playing some type of double or nothing game. While such double or nothing games have varied names and formats, they are essentially the same: The player guesses that the next card in the deck will be either higher or lower than a designated card. If he guesses correctly, he wins double the credits won in the preceding game (and can then go double-or-nothing again); if he guesses incorrectly, he loses all credits won in the previous game.

Some of these machines contain a key-operated "knock-off switch" by which accumulated credits may be "counted down" or erased. It appears that, when manufactured, the knock-off switch in certain of these machines is not operational. However, the necessary wiring and the switch itself are in place, and it is a simple matter to connect the two. In machines without a "knock-off switch" or where the switch is not connected, credits may be erased by inserting a paperclip or similar object through a pinhole located on the drop door of the cabinet. In addition, some machines contain a meter registering the number of games erased, so that the owner may know how many games were "knocked off." These devices facilitate the practice whereby upon the erasure of credits a player is awarded cash winnings by an employee of the licensee. The brochures also indicate that these machines have the ability to be operated in several other "mode configurations." By the addition of an optional device,

known as a "token dispenser" or "hopper", a ticket, coin or token payout is automatically made by the machine for points accumulated.

Plaintiffs contend that their machines are different from those described in the brochures. They maintain that their machines do not deliver any automatic payoff or in any fashion operate to entitle the person playing the machine to receive cash or tokens. Plaintiffs assert the only thing that their machines do is permit the players to accumulate skill points towards free games. They also point out that to convert their machines to machines similar in function to those described in the brochures would require not only electronic reprogramming but also major physical changes which would be visible externally. They claim, therefore, that: (1) their machines are not slot machines within the purview of the applicable statutes or regulations; (2) the Director's decision was arbitrary and capricious and made without the benefit of a hearing or inviting public comment, and (3) the Director did not have authority to determine the nature and character of these machines.

It is beyond dispute in this State that the regulation of the field of intoxicating liquors is within the police power of the State, and the State's authority in this area is extensive. *See Fanwood v. Rocco,* 33 *N.J.* 404, 411 (1960). In the exercise of this broad power, the Legislature enacted the Alcoholic Beverage Law, *N.J.S.A.* 33:1–1 et seq., creating the Department of Alcoholic Beverage Control, *N.J.S.A.* 33:1–3, the functions, powers and duties of which were transferred to the Division of Alcoholic Beverage Control ("Division") by *N.J.S.A.* 52:17B–15. The Division is, pursuant to *N.J.S.A.* 52:17B–16, headed by a director, who, in accordance with *N.J.S.A.* 52:17B–17, is empowered by *N.J.S.A.* 33:1–39 to:

> [M]ake such general rules and regulations and such special rulings and findings as may be necessary for the proper regulation and control of the manufacture, sale and distribution of alcoholic beverages and the enforcement of this chapter. . . .

In addition, *N.J.S.A.* 33:1–39 specifically provides that "[s]uch rules and regulations may cover ... gambling, slot machines and gambling devices."

In accordance with this authority, the Director promulgated *N.J.A.C.* 13:2–23.7, which provides, in relevant part:

(a) No licensee shall engage in or allow, permit or suffer in or upon the licenses premises:

3. Any pool-selling, bookmaking or any unlawful game or gambling of any kind;

4. *Any slot machine or device in the nature of a slot machine which may be used for the purpose of playing for money or other valuable thing;* [Emphasis supplied.]

5. Nor shall any licensee possess, have custody of, or allow, permit or suffer in or upon the licensed premises any slip, ticket, book, record, document, memorandum or other writing pertaining in any way to any lottery, pool-selling, bookmaking or unlawful game or gambling of any kind.

Here the Director determined that video poker, blackjack and other similar machines violated subsection 4 of the regulation and on this basis proscribed the placement of such games in liquor licensed premises in New Jersey.

■ We are thoroughly convinced from our study of the record submitted on this appeal that the Director properly concluded that the machines described in the brochures violate subsection 4 of *N.J.A.C.* 13:2–23.7 and therefore are prohibited on licensed premises. These machines have marginal amusement value, encourage gambling between the player and observers, and are susceptible to serving as the basis for an award of money or other valuable things by the licensee to a player on the basis of the player's score or points won. Although there does not appear to be any reported case directly on point in this State, other jurisdictions have found similar video card games to be either gambling devices or susceptible to use as gambling devices. In *Commonwealth v. One Electro-Sport Draw Poker Machine,* 502 Pa. 186, 465 A.2d 973 (Sup.Ct.1983), the Pennsylvania Supreme Court determined that one such device, known as the Electro-Sport Draw Poker Machine, constituted a gambling device *per se.* Measuring the machine against the three ele-

ments considered necessary for gambling, these being considera-
tion, a result determined by chance rather than skill, and a
reward, the court concluded that the Electro-Sport game was
"so intrinsically connected with gambling" as to be a gambling
device *per se.* It is the court's analysis in *Electro Sport* with
respect to the element of reward which is of significance here:

> The last element—reward—is also present in the Electro-Sport machine,
> despite the fact that the game ostensibly gives only free games to the winner.
> Although a free game in and of itself does not constitute a reward, *In re Wigton,
> supra,* [151 *Pa.Superior Ct.* 337, 30 *A.2d* 352 (1943)], the awarding of free games
> by a machine which possesses other characteristics can be taken to constitute a
> sufficient reward. We agree with the analysis of Commonwealth Court in [*Commonwealth v.*] *9 Mills Machines, supra* [62 *Pa. Commonwealth Ct.* 397, 437 *A.2d*
> 67 (1981)]:
>
>> The ability to knock-off free games, the presence of meters to enable the
>> owner to determine how many games were knocked-off, the ability of a player
>> to hold a part of his previous play over to the next game in order to increase
>> his or her chances of winning a higher pay-off on the next game, and the
>> extremely short playing time involved compels the conclusion that the reward
>> of a free game constitutes a thing of value.
>
> 62 *Pa. Commonwealth Ct.* at 404, 437 *A.2d* at 71 (citations omitted). All of these
> features are present on the Electro-Sport machine, as well as a "dip switch"
> which allows the owner to vary the number of game credits per coin. None of
> these features is necessary to the functioning of the device as a legitimate
> profit-making amusement game. Rather, they provide circumstantial evidence
> which we believe establishes by a preponderance of the evidence a sufficient
> reward to meet the third element of the test for a gambling device *per se.*

*See also Games Management, Inc. v. Owens,* 233 *Kansas* 444, 662
*P.2d* 260 (Sup.Ct.1983); *Mills-Jennings of Ohio, Inc. v. Dep't of
Liquor Control,* 70 *Ohio St.2d* 95, 435 *N.E.2d* 407 (Sup.Ct.1982);
*Commonwealth v. Nine Mills Mechanical Slot Machines,* 62 *Pa.
Commonwealth Ct.* 397, 437 *A.2d* 67 (Cmwlth.Ct.1981).

We are entirely satisfied that the Director acted properly in
advising alcoholic beverage licensees that video poker, blackjack,
dice, roulette and other electronic forms of traditional gambling
games or devices such as those described in the brochures are in
the nature of a slot machine within the meaning of *N.J.A.C.*
13:2–23.7(a)(4) and are therefore prohibited on licensed premises.

However, since plaintiffs claim that their machines are
different in design and manufacture from those described in the

brochures and since they were not afforded the opportunity to present such evidence in the first instance before the Director, we deem that the interests of justice and administrative due process will best be served by affording them an opportunity to present their proofs to the Director in an effort to show that their machines do not fall within the proscription of the administrative ruling.[1] In this regard we emphasize that the Director shall determine the appropriate type of hearing that is to be conducted. Accordingly, the matter is remanded to the Director for further proceedings. In the interim, the stay of the implementation and enforcement of the Order of the Director of the State Division of Alcoholic Beverage Control, Bulletin 2430, Item 3, previously issued by this court, shall continue in full force and effect. We do not retain jurisdiction.

---

[1] In this regard, the fact that the machines sought to be placed in liquor licensed establishments may be shown not to have, or be capable of modification to include, any automatic payout device, of whatever form, shall in no way detract from a finding that such machines are prohibited.