## Laris Enterprises, Inc., Appeal

*Richard P. Steward*, District Attorney, for petitioner.
*John Alan Conte*, for respondent.

McCreary, P. J., January 21, 1963.—This is a proceeding in rem under the provisions of the Act of March 31, 1860, P. L. 382, sec. 60, instituted and prosecuted by the district attorney of Beaver County for the forfeiture and destruction of three pinball machines, two of them of the "in line" bingo type and the other of a similar type, alleged to constitute gambling devices. A return was duly made, and on April 25, 1962, a hearing was commenced on a rule duly issued requiring the Laris Enterprises, Inc., to show cause why the three machines should not be condemned and declared forfeited as gambling devices "per se." From the testimony adduced at the hearing we find the facts to be as follows:

1. On December 12, 1961, Beaver County detectives visited the Colonial Grill on Merchant Street, Ambridge, Beaver County, Pennsylvania, having with them a search warrant directed to that place from Justice of the Peace Frank Storar and there took into custody three coin machines, namely: Lotta-Fun, #B2063; Lotta-Fun, #B2777; Old Plantation, #KE-1066; and had the county works department transport the machines to the court house shortly thereafter. Detective Meskow had been in the Colonial Grill on a previous day and had noted the machines.

2. The three machines in question were lawfully taken into custody from Colonial Grill at Ambridge, Beaver County, Pennsylvania, on December 12, 1961, by Beaver County detectives acting under a search warrant obtained by them from Squire Storar.

3. The machines are owned by Laris Enterprises, Inc. (hereinafter termed the operator), of which George Laris, who is a resident of Ambridge and who was present in court for these proceedings, is president.

4. Lotta-Fun #B2063 is a bingo type pinball coin machine manufactured by Bally Manufacturing Company, at Chicago, Illinois, condemned by the case of Trombetta Return, 16 D. & C. 2d 363, affirmed sub nomine American Legion Post No. 51 Appeal, 188 Pa. Superior Ct. 480.

5. The playing field is an inclined horizontal plane sloping downward toward the player under a plate glass cover. To the player's right is the typical pinball machine plunger and chute from which he propels balls onto the field where they tend to roll with the incline. In the field are 25 holes numbered consecutively from player's left to right and from top to bottom, and a single unnumbered hole at the very bottom; and the field is studded with rubber-ringed pegs and spring-steel bumpers to obstruct a ball descending the plane and cause it to take erratic courses.

6. The score board of the machine is a vertical plate glass facing the player from the opposite end of the playing field. Across the top of the glass in an arched horizontal line from player's left to right we see 100, 200, 300, etc., to 900 inclusive; next below in a similar line, 1,000, 2,000, etc., to 9,000 inclusive; next below we see 10,000, 11,000, etc., to 20,000; below those figures the name of the machine, Lotta-Fun, and figures of young folks riding a merry-go-round; the bottom half of the glass shows six bingo cards designated first, second, third from left to right, and under those, three more, fourth, fifth, sixth. Each card shows the numbers 1 through 25, five across and five down, apparently arranged at random. However, study shows they are so arranged that a player cannot get 4-in-line or 5-in-

line on more than one card at a time, although, if only one dime is played, the other five cards light up in such a manner as to make the player wish he had played another card or another dime. The card not played gives no free games. It constitutes a lure to induce him to play more dimes the next time he plays.

7. The machine is powered by electricity and activated by inserting a dime. It is operated, externally, by the player propelling five balls onto the playing surface. It is operated, internally, by complicated automatic electrical and mechanical devices which are put into action by electric contact made when a ball comes to rest in one of the 25 numbered holes. If a ball finds its way into the unnumbered hole it goes through the machine and into play again, it is a "free" ball.

8. One dime deposited lights part of the scoreboard including the word first under the first of the six bingo cards and puts that card, only, in play. Further, it activates the machine so that the player may shoot five balls and take his chances, on the first card only. As a ball comes to rest in a numbered hole on the field, that number lights up on each bingo card that bears that number. It counts for the player only if it is on a card, or cards, in play. One dime, one chance to win; two dimes, two chances to win, etc.

9. A player wins if a bingo card which is in play shows three or more numbers lighted in a diagonal or horizontal or vertical line: 3-in-line scored 400, 4-in-line scored 2,000, 5 in-line scored 20,000, and each 100 scored was good for one replay. If a player plays only one dime, his chance to make a big score is only one-sixth of what his chance is if he plays six dimes on six cards, just as it is on a regular bingo game.

10. A player may insert a second dime before shooting a ball, and the word second will light up, and then that card is in play; and so on, up to six dimes for six cards to be in play. Whether the play be on one dime,

or more, only the same five balls are played. It is a mathematical fact that in such a situation a player putting in more than one dime does not proportionately better his chance of winning, but for six times as much chance of winning as he has on one dime.

11. An inducement to a player to spend multiple dimes before playing the five balls is the printed notice on the playing surface which reads "Center Number of One Card May Be Spotted When First Ball Is Shot." Spotted means lighted without a ball resting in the hole which bears the corresponding number. That is approximately the equivalent of an extra ball for the player, although not quite, for the advantage can disappear if one of the five balls happens to land on a number which the automatic contraption has already spotted. The words "One" and "May" mean just that, it is a pure chance proposition to the player, completely beyond his control. Out of sight of the player the machine is equipped with an electric spotting unit adjustment. The operator can control the frequency with which players are granted that advantage, by his manipulation of the adjustment, making it liberal or conservative. It is under the operator's exclusive lock and key, beyond the control of the location owner, and beyond the awareness of the average player. Inside the machine is a three pronged plug, adjustable by the operator and unknown by the player, which adjusts the frequency of the advantage. It reads as follows inside the machine:

```
1–
2–
3–

↑
Spotting
Unit
Adj.
```

12. Out of sight of the player, the machine is equipped with an electric tilt mechanism which is under the exclusive control of the operator. It is adjustable, so that the operator can make the machine as sensitive as he deems profitable to him. The function of the device is to prohibit the player from physically affecting ("gunching") the course of the ball down the playing field, and to leave its course to chance.

13. Out of sight of the player, the machine is equipped with an electric "Red Button Adj." by which the operator can set the machine so that games won cannot be played off, can only be "knocked off." This adjustment discredits completely the contention that the machine is an amusement device. Inside the machine is a manual controlled plug having two male points with instructions to the operator as follows:

```
– Off
– On
Red
Button
Adj.
```

To get the "free games" off, you must disconnect the machine.

14. Out of sight of the player, the machine is equipped with a 5-in-line score adj. and a 4-in-line score adj., each of which is a set of male-female electrical connection plugs which are under the lock and key of the operator, beyond the control of the location owner and beyond the awareness of the average player. By adjusting those plugs, the operator can have his machine give the player either 10,000 or 20,000 for 5-in-line; and anywhere from 2,000 to 3,600 for 4-in-line, and the so-called skill of the player is for naught. The legends inside the machine adjacent to the electrical plug read as follows:

20,000
10,000

5
In-Line
Score
Adj.

– 3600
– 3200
– 2800
– 2400
– 2000

4
In-Line
Score
Adj.

15. The play of a game takes from 7 to 35 seconds.

16. This machine is equipped with an electric coin-apportioning device which automatically divides between the operator of the machine and the location owner the coins deposited in the machine. The operator has his coin box under his exclusive lock and key, and likewise the location owner has his. The operator has control of the apportioning device and it may be adjusted to apportion the coins 1 in 2 (which means 50-50), or 1 in 3 (which means 1 to the machine operator and 2 for the location owner), and so forth to 1 in 6. This device first appeared on coin machines shortly after the ruling outlawing machines carrying a meter to record the number of games "knocked off." It eliminated the need for such a meter. It is a device conjured up by the manufacturer as a substitute for the meter

registering the number of free games knocked off and not played, which was condemned by the appellate courts. It is just as accurate and dependable as the meter system.

17. The other Lotta-Fun machine, #B277, is identical in design, function, scheme and use.

18. The machine called Old Plantation, #KE1066, was manufactured by J. N. Keeney & Co., Inc., at Chicago, Illinois. It is similar to the Keeney machine condemned in the case at 197 Pa. Superior Ct. 10. It is a combination of the slot machine, known as one-arm-bandit, and the pinball machine. It is powered by electricity, and activated by insertion of a dime. It is operated, externally, by the player propelling a ball (or two, at the choice of the operator and without the knowledge of the player) onto the playing field. It is controlled internally by complicated automatic electrical and mechanical devices in the nature of male and female plugs which are beyond control of the player.

19. The score board of the machine is vertical plate glass facing the player. Above the glass are three circular openings, termed the panascope. When the machine is activated by insertion of a dime, symbols such as horseshoe, shamrock, heart, etc., flash on and off for 3 or 4 seconds in the panascope until the flashing ceases and three symbols remain stationary and lighted, similar to the lemons, plums, bells, etc., on the old-fashioned slot machine. Below the panascope are three meters, each having three digits, the one to player's left designated total-score, the middle one hi-score, and the right one sub-total. Below the meters to player's left on the score board are 13 horizontal rows of such symbols, three to a line. To the right of the symbols there appears a "Southern Society" scene. Below the scene appears the name of the machine, Keeney's Old Plantation. The function of the panascope is precisely similar to the one-arm-bandit type coin machine. When the

flashing in the panascope ceases, the player sees a combination of three symbols which is or is not listed below as an odds-giving combination. When the panascope shows a combination of symbols, not listed below as giving the player better odds to win on the pinball shooting, more and more dimes may be inserted, again giving the player a 3 or 4 second flashing of the symbols. This too is an attraction for playing more dimes.

20. The playing field is an inclined horizontal plane sloping downward toward the player under a plate glass cover. To the player's right is the typical pinball machine plunger and chute from which he propels balls onto the field where they tend to roll with the incline. The field is studded with rubber-ringed pegs and electrically energized bumpers which cause a ball descending the incline to take erratic courses. As the ball strikes certain of those obstacles, electric contacts are made which register points for the player. A card at player's lower left on the playing field outlines the scoring scheme. This card reads as follows:

---

### Scoring

1. "Total Score". Registers Points after Scoring Sequence Appears on Panascope and Minimum "Hi Score" (As Indicated Below) Is Made

   Hi Score of 190 Lites 1st Column
   Hi Score of 390 Lites 2nd Column
   Hi Score of 490 Lites 3rd Column
   Hi Score of 590 Lites 4th Column
   Hi Score of 690 Lites 5th Column

2. "Total Score" Registers 1 Point for "Hi Score" of 690 and 1 Additional Point for Each Additional 100 Advance in "Hi Score".

3. When "Total Score" and "Sub Total" Are Equal Coins Must Be Used.

*If* the player's pinball performance scores 190 on the high-score meter, what appeared to be merely a column in the scene on the backboard lights up and reveals numbers showing how many points he got on total-score, *if* he had a winner in panascope. High enough scores in pinball performance will light up the others of the five columns in the scene in turn, which will show higher odds due the player, *if* he had a winner in the panascope. If the player was not lucky on the panascope, the "slot" machine half of the device, he will get one point on total-score *if* his pinball performance nets him a high-score of 690. Chief County Detective Meskow played this machine more than 700 times during his study of it, and he never was able to score 690 points on the pinball half of this device.

21. When a player has scored points on the total-score meter, he may use them to replay the machine. Each point is equivalent to the dime it costs to activate the machine. When a player wishes to play off a game he has won, he may push the green button as directed by the printed card on the playing field. When he does so, the meter designated sub-total will record 1, 2, 3, etc., for as many games as are thus played off. When the number of games played off and tabulated on the sub-total meter equals the number of won games tabulated on the total-score meter, then coins must be used.

22. Out of sight of the player, it is equipped with a dial which is under the exclusive control of the operator and which can set the machine at nine different degrees of paucity in rewards ranging from H. L. to L. C. The initials are interpreted as meaning from high liberal to low conservative. This adjustment is entirely beyond the control of and probably beyond the awareness of the player. Plugs with nine male prongs fitted into appropriate female openings determine, at the whim of the operator, what the odds are.

23. Out of sight of the player, it is equipped with

an electrical adjustment which assures the operator a paucity of red arrows, a "wild" symbol, on the pana-scope, thus affecting the odds against the player winning. This is under the exclusive control of the operator, and beyond the control or even the knowledge of the player. This is a four-prong adjustment beyond the control of the player which determines the liberality of the machine.

24. Out of sight of the player, it is equipped with an adjustment, consisting of prongs on a plug which fit into female openings, under the exclusive control of the operator, which will allow the player one ball for trying for high score on the pinball aspect of the game, or two balls. This, obviously, halves or doubles the player's chance to win, but it is entirely beyond the player's control.

25. This machine is equipped with an electric coin-apportioning device which automatically divides between the operator of the machine and the location owner the coins deposited in the machine. The operator has his coin box under his exclusive lock and key, and likewise the location owner has his. The operator has control of the apportioning device and it may be adjusted to apportion the coins 1 in 2 (which means 50-50), or 1 in 3 (which means 1 to the machine operator and 2 for the location owner), and so forth to 1 in 6. This device first appeared on coin machines shortly after the ruling outlawing machines carrying a meter to record the number of games "knocked off." It eliminated the need for such a meter. It is a device conjured up by the manufacturer as a substitute for the meter registering the number of free games knocked off and not played, which was condemned by the appellate courts. It is just as accurate and dependable as the meter system.

26. The Plantation machine in question operates entirely by chance, as do the two Lotta-Fun machines.

27. On none of the machines in question is there a "knock-off button" or recording meter, but all three are so constructed that, by pulling the plug from the electrical outlet and reinserting it, all free games, registered as having been won, are "knocked off."

28. The three machines in question are prominently labeled with the legend "for amusement only", just as are all football and baseball pool tickets.

### Discussion

In the case of Commonwealth v. Laniewski, 173 Pa. Superior Ct. 245, a case which went up to the appellate court from our court and there affirmed, an observation was made by the writer of this opinion as follows:

"It has been said that no sooner is the term 'lottery' defined by a court, than ingenuity evolves some scheme within the mischief discussed, although not quite within the letter of definition given; but an examination of the many cases on the subject will show that it is very difficult, if not impossible, for the most ingenious and subtle mind to devise any scheme or plan, short of a gratuitous distribution of property, which has not been held by the courts of this country to be in violation of the lottery laws in force in the various states of the Union. The court will inquire, not into the name, but into the game, however skilfully disguised, in order to ascertain if it is prohibited, or if it has the element of chance."

That observation was never more accurate than it became after our Superior Court outlawed the bingo or "in line" type of machine manufactured or sold by Bally Manufacturing Company of Chicago in the case of American Legion Post No. 51 Appeal, 188 Pa. Superior Ct. 480, and outlawed the Red Arrow machine, manufactured by J. N. Keeney & Co., Inc., Chicago, Illinois, in Magaro Appeal, 197 Pa. Superior Ct. 10. It is true that following the appellate court decision in those cases the manufacturers eliminated a knock-down

button for releasing free games and a meter registering the number of free games so released, but they have substituted therefor in the machine a gimmick called a coin-divider, the purpose of which is just as obvious as the meter, for informing the operator and the location owner how many free games were paid for by the location owner. We refer to our finding of fact no. 16, describing the Lotta-Fun machines and our finding of fact no. 25, describing this device on the Old Plantation machine. If the machine is for amusement only, why two coin boxes for gathering in the dimes of the players? The operator by manipulating plugs inside the machines can regulate the division of the dimes inserted by the players so as to give him one dime out of every two played, one of every three, one of every four, or one of every five. Assume he has it so set as to divide the coins on a 50-50 basis. When he opens his coin box and finds $10 in dimes therein and only $5 in the location owner's box, the location owner has paid out $5 for free games. If he has the plugs set to give him one dime out of every three played, and he finds $10 in his box and only $10 in the location owner's box, it is obvious that the location owner has paid out $10 to players for free games.

George Laris, testifying against the Commonwealth position, said that "the purpose of those coin '(dividers)', boxes is to leave change with the operator of the establishment, so that he does not have to run to the bank or out of his place of business to get change." That is as phony as a three dollar bill. They never had to "run out and get change" prior to the appellate court's outlawing the knock-down button and meter for registering the number of free games knocked off. They only found it necessary to provide change for the location owner when they found it necessary to find some device for keeping the operator advised as to how many "free games" the location owner paid off. Even

Laris' own witness, Sergeant Julius A. Trombetta, testified as follows:

"Q. Yes. Now, with regard to the coin division mechanism, that Mr. Meskow explained to the Court, in this machine—and that was before you were here, I believe—at any rate, are you familiar now with these mechanical arrangements that divide the coins into those two coin boxes?

"A. No. The first time I ran into that one was when I made a study of the Old Plantation. That was just recently.

"Q. And with regard to the mechanism for the division of the coins, and that puts some coins into one coin box, and some coins into a different coin box, when did that mechanical arrangement first come into use, as far as your knowledge of coin machines is concerned?

"A. That was after the Fayette County case.

"Q. What is the purpose of this coin dividing mechanism, with regard to the Fayette County case?

"Mr. Conte: We object to that. The Fayette County case, we are not concerned with it; it is this particular machine.

"Mr. Steward: That is the passport to my case. I am relating it to the Fayette County case now because obviously the Fayette County case is the criterion of the case law thus far; that being the case that ruled out the multiple pinball machines. I now propose to have Officer Trombetta explain to the Court what he found with regard to the pinball coin machines promptly after the Fayette County opinion was handed down.

"The Court: The objection overruled; exception. You may answer the question.

"A. They eliminated it.

"The Court: The necessity for the meters?

"The Witness: The necessity for the meters, they eliminated it. The old type machines had the meter

inside the door; but this attachment eliminated the two meters.

"The Court: Do you mean that this is substituted for the meters?

"The Witness: Yes, that is, the division of the money, or the division of the spoils."

By utilizing the "automatic apportioner" they eliminated the tell-tale meter outlawed by the American Legion No. 51 case, supra, and they are now "back in business at the same old stand" with a new device for measuring division of the spoils.

We repeat, in part, what we said recently in the case titled, Re: Two Console Type Coin Machines, no. 7, November term, 1961, misc.:

"From the testimony it is difficult for the Court to distinguish the complicated mechanism of the Twin Red Arrow or the Wild Cat, manufactured by Keeney, from the lures and traps of the Keeney Red Arrow machines condemned by the Court in the case of In re American Legion Post No. 109, 25 D. & C. 2d 572, affirmed per curiam by the Superior Court, 197 Pa. Superior Ct. 10. (Entitled Magaro Appeal).

"In that case it was held, on the opinion of the court below that (pp. 10, 11):

" 'In a proceeding upon a petition and rule, under §60 of the Act of March 31, 1860, P. L. 382, for forfeiture and destruction of certain slot machines on the ground that they were unlawful gaming devices per se, in which it appeared that no evidence was offered as to the actual use of any of the machines for the purpose of gambling; and that the court below, after finding that the machines in question operated entirely by chance and that there was no element of skill involved, that the denomination of the coin used to activate each machine could be varied by the owner by a simple interchange of a coin receiver unit, that the machines were so equipped that free games won by the operator could

easily be cancelled, that the machines contained meters for reporting the number of free games cancelled, that by minor adjustment in the machines the chances of winning could be increased or decreased, that the machines could be readily converted into actual coin payout machines, that the machines were complete within themselves and neither the operator nor anything else could decide as to the winning of free games, that certain of the machines were equipped so as to permit the operator to hold a part of a previous play, and that the period of play was from 3.5 seconds to 8 seconds, concluded that the machines were essentially gambling devices; it was held that the order of the court below making absolute the rule should be affirmed.' "

In the case we are considering, all of the features of the machines condemned in the last mentioned case are present, except that there was no evidence that they were equipped with meters for reporting the number of free games cancelled. We are of the opinion that the absence of this gimmick is not sufficient to merit the blessing of the court or to stamp the machines as harmless amusement devices. Just after the Superior Court outlawed the bingo type pinball machines in the case of American Legion Post No. 51 Appeal, 188 Pa. Superior Ct. 480, the machine manufacturers began altering the mechanism of their make by removing the meter for registering the number of free games cancelled and substituting therefor many multi-pronged plugs, by means of which the owner can modify the combination of symbols on the reels to increase or decrease the mechanical chances of winning sequences appearing. What was said by Judge Shughart in the lower court and affirmed on his opinion in the Superior Court in the case of In Re American Legion Post No. 109, 25 D. & C. 2d 572, is apropos here. He said, inter alia (pp. 577, 581-582, 583-584, 584-585) :

"While it is obvious that the player can exercise no

control over the combinations that appear, the owner of the machines can modify the combinations of symbols on the reels to increase or decrease the mechanical chance of winning sequences appearing. This can be done by replacing the reels. By the changing of the positions of multi-pronged plugs, the owner can control the number of times the 'extra draw star' will appear. By the use of similar plugs, the number of free games awarded for a jackpot can be changed. . . .

"All of the machines in question operate entirely by chance, and there is absolutely no element of skill involved over the outcome of the play on the machine. In Wigton's Return, 151 Pa. Superior Ct. 337, 344, the court said:

" 'Since normally people do not play games of *pure chance* for recreation or amusement without betting on the outcome, such proof would be some *evidence* of their use for unlawful gaming.' (Italics supplied.)

"As suggested by Judge Campbell in Commonwealth v. Two Gambling Devices, 1 Centre 181, this element of chance should be enough in itself to label the machines as unlawful gaming devices, although such has never been held. . . .

"By a minor adjustment in these machines, the owner could control the degree of game difficulty and increase or decrease the chances of winning. A machine used merely for recreation would scarcely have need for such an intricate adjustment system. This aspect of all machines is evidence of their unlawful purposes: American Legion Post No. 51 Appeal, supra; Commonwealth v. Two Gambling Devices, supra. . . .

"These machines are complete within themselves, and neither the operator nor anything else can decide whether or not free games are won. This feature likewise has been held to constitute evidence that a machine is an illegal gaming device: Urban's Appeal, supra; Commonwealth v. Two Gambling Devices, supra. . . .

"The longest period required to complete a play on any of the machines was eight seconds while only 3.5 seconds was required to complete a play on the Drawbell machines. It is, therefore, possible to play between 450 to 1,000 plays per hour on these machines. If the machines were equipped to receive nickels, the operator could amuse himself for one hour by the expenditure of $20 to $50 if he did not win any free games. In American Legion Post No. 51 Appeal, supra, at page 490, there was testimony that a witness had lost $86 during one day playing a machine and gave up playing the machines when her total loss amounted to $3,000. A player could do as well on any of the machines here involved. While the play on all of these machines was accompanied with the flashing of multi-colored lights and symbols, it is difficult to see how the average person would engage in this as a pastime for sheer amusement. Respondents contend that these machines can be used for amusement and recreational purposes, but it is significant that they did not offer any evidence in support of this contention. We feel that the extreme brevity of time consumed in the operation of these machines is evidence to support the finding that they are gambling devices per se."

The judges of the Pennsylvania courts will be writing opinions in pinball machine cases as long as the ingenuity of machine manufacturers holds out, because, as soon as our appellate courts point out a feature that makes a machine an outlaw, the electronic experts come up with another substitute gadget for catering to man's gambling instinct. There can be no doubt that by the manipulation of the several multi-pronged plugs (all in the control of the actual owner of the machine) the actual owner can determine statistically, over a period of time, how many free games have been won by the players and hence determine how much the location owner has had to pay out for free

games won. Else, why the plugs to control the degree of game difficulty and increase or decrease the chances of winning?

Either the legislature or the appellate courts should do what they have done in Ohio. Either declare "free plays" a thing of value, and hence one of the elements of the lottery, or define the limits to which the manufacturers may go in devising lures for catering to man's gambling instincts in the operation of these machines.

We are "satisfied that the machines in question were employed and used for the purpose of unlawful gaming" and are of the opinion that they should be adjudged to be forfeited and publicly destroyed.

Laris Enterprises, Inc., defends on the further claim by him that the Act of March 31, 1860, P. L. 382, sec. 60, 18 PS §1445, violates the Constitution of the United States. That section of the Criminal Code of 1860 reads in part as follows:

"It shall and may be lawful for any sheriff, constable or other officer of justice, with or without warrant, to seize upon, secure and remove any device or machine of any kind, character or description whatsoever, used and employed for the purposes of unlawful gaming as aforesaid, and to arrest, with or without warrant, any person setting up the same."

What was said by the Supreme Court in Dwyer v. Dilworth, 392 Pa. 123, 127, is apropos here:

"We need not dwell upon plaintiff's strained and tenuous argument; plaintiff, even if correct, is not the proper party to raise this constitutional question. As we said in Knowles's Estate, 295 Pa. 571, 580-582, 145 Atl. 797 (1929) : '[it is fundamental that] . . . a court will not heed objections to the constitutionality of an act unless the complainant is harmed by the particular feature alleged to be in conflict with the Constitution.

" 'The above principle is but one of the many variations of the general rule that "a court [will not] listen

to an objection made to the constitutionality of an act by a party whose rights it does not affect; . . . for only persons materially affected are entitled to raise constitutional questions" . . .' "

See also Booz v. Reed, 398 Pa. 172.

It is abundantly clear from the record, and not contradicted, that the county detectives were armed with a proper search warrant at the time they seized the machines in question and there was no arrest of George Laris or anybody else involved. Constitutional questions cannot be decided in a vacuum. There being a lawful seizure warrant and there being no one arrested, there is nobody who was harmed. The objection must be overruled.

Entertaining these views we make the following:

### Order

Now, January 21, 1963, the rule heretofore issued requiring Laris Enterprises, Inc., to show cause why the machines in question should not be condemned and forfeited as gambling devices, illegal per se, is made absolute and the machines, Lotta-Fun, #B2063, Lotta-Fun, #B2777, and Old Plantation, #KE1066, are hereby condemned and forfeited and they are ordered to be publicly destroyed in accordance with the provisions of the Act of March 31, 1860, P. L. 382, sec. 60. The costs are to be paid by Laris Enterprises, Inc.